**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION**

| | |
|---|---|
| Derek Williams, Corey Smith, William Wyatt, and Heather Iwinski, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs<br>vs.<br><br>D.R. Horton, Inc., Alpha & Omega Construction, LLC, Cannady Siding & Gutter, Inc., L&M Electric, Inc., Long Heating & Air Conditioning, Inc., and M&L Reyna Construction, LLC,<br><br>Defendants. | **CASE No.: 8:26-CV-00097-DCC**<br><br><br><br>**DEFENDANT D.R. HORTON, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO STAY ACTION AND COMPEL ARBITRATION** |
| D.R. Horton, Inc.,<br><br>Crossclaim Plaintiff and Third-Party Plaintiff,<br><br>vs.<br><br>Alpha Omega Construction Group, Inc., Cannady Siding & Gutter, Inc., L&M Electric, Inc., Long Heating & Air Conditioning, Inc., and M&L Reyna Construction, LLC,<br><br>Crossclaim Defendants, and<br><br>Mark III Properties, LLC; P&L Enterprises, LLC; Damian Magos Mendoza; General Shale Brick, Inc.; Meridian Brick, LLC; Rite Rug, Co.; Builders First Source – Southeast Group, LLC; Brand Vaughan Lumber, Co.; Valmen Solutions, LLC; Bravo Carpenters, Inc.; CJ Framing, LLC; Get Floored, LLC; Lansing Building Products, LLC; American Concrete & Precast, LLC; Five Star Foundations, LLC; One Tree Hill, Inc. d/b/a Willis Landscaping; The Loving Group, LLC; All in One Insulation, LLC; Marlowe Environmental, LLC; | |

Kings Landscaping, LLC; Earthworks Unlimited, Inc.; CSI Erosion, Inc.; CSI Erosion SC, Inc.; Superior Grading, LLC; Cedar Ridge Landscaping, LLC; Dupree Plumbing Co., Inc.; A-Z, Inc; Installed Building Products, LLC d/b/a Custom Glass Atlanta; Saldana Brothers, Inc.; 84 Lumber Company; Carter Lumber Company; Justin Villines, LLC; GBS Building Supply US LBM, LLC; Garcia Painting & Drywall, LLC; UTM Enterprises, Inc.; McGillicuddy Concrete, LLC; Bianchi & Company, Inc.

Third-Party Defendants.

Defendant D.R. Horton, Inc. ("D.R. Horton" or "Defendant") submits this Memorandum in Support of its Motion to Stay Action and Compel Arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, et seq. For the reasons set forth therein, the motion should be GRANTED.

## FACTUAL BACKGROUND

D.R. Horton has developed a number of subdivisions in South Carolina, including Rivermill Subdivision in Piedmont, South Carolina ("Rivermill").

Plaintiff William Wyatt entered a contract with D.R. Horton (the "Wyatt Contract") for the purchase of a home within Rivermill, specifically located at 126 Rivermill Place, Piedmont, South Carolina (the "Wyatt Home").

Plaintiff Heather Iwinski entered a contract with D.R. Horton (the "Iwinski Contract") for the purchase of a home within Rivermill, specifically located at 406 Brandybuck Drive, Piedmont, South Carolina (the "Iwinski Home").

Upon information and belief, Plaintiff Derek Williams purchased a home within Rivermill, specifically located at 423 Brandybuck Drive, Piedmont, South Carolina (the "Williams Home"),

from Juanita E. Pickens and Raymond S. Pickens, who entered a contract with D.R. Horton for the purchase of the Williams Home (the "Pickens Contract").

Upon information and belief, Plaintiff Corey Smith purchased a home within Rivermill, specifically located at 165 Rivermill Place, Piedmont, South Carolina (the "Smith Home"), from Erik M. Bianchi and Christen M. Bianchi, who entered a contract with D.R. Horton for the purchase of the Smith Home (the "Bianchi Contract").

The Wyatt Contract, Iwinski Contract, Pickens Contract, and Bianchi Contract are referred to collectively as the "Homeowner Contracts," and the Wyatt Home, Iwinski Home, Williams Home, and Smith Home are referred to collectively as the "Homes." Copies of the Wyatt, Iwinski, Pickens, and Bianchi Contracts are attached hereto and incorporated by reference as **Exhibit A**, **Exhibit B**, **Exhibit C**, and **Exhibit D**, respectively.

As part of the Homeowner Contracts, Plaintiffs and D.R. Horton mutually agreed to submit all disputes between them to binding arbitration. The entirety of the arbitration provision provides as follows:

> **Mandatory binding arbitration.** Purchaser and seller shall submit to binding arbitration any and all disputes which may arise between them regarding this agreement and/or the property, including but not limited to any disputes regarding: (a) seller's construction and delivery of the home; (b) seller's performance under any punch list or inspection agreement; and (c) the limited warranty pursuant to section 14 above.

> The arbitration shall take place in the county in which the property is located.

> The proceeding shall be conducted pursuant to the rules of the American Arbitration Association, and to the extent possible, under rules which provide for an expedited hearing.

> The filing fee for the arbitration shall be paid by the party filing the arbitration demand, but the arbitrator shall have the right to assess or allocate the filing fees and any other costs of the arbitration as a part of the arbitrator's final order.

> The arbitration shall be binding and final, and either party shall have the right to seek judicial enforcement of the arbitration award.
>
> Notwithstanding any other provision herein, any disputes arising under the limited warranty shall be mediated, arbitrated and/or judicially resolved pursuant to the terms, conditions, procedures and rules of that warranty program.
>
> Notwithstanding the foregoing, seller shall have the right to interplead all or any part of the earnest money into a court of competent jurisdiction as provided for in section 4 herein. Notwithstanding the foregoing, the arbitration provisions of this subsection (b) shall not apply in the event that the dispute relates to a default by the seller under section 16(f) of this agreement

(*E.g.*, Wyatt Contract § 15 (formatting altered).)

Plaintiffs have now filed this lawsuit alleging defects related to the Homes' exterior building envelope (including roofing, masonry and siding cladding, and fenestration systems); flooring; MEP (mechanical, electrical, plumbing) deficiencies; water intrusion; and insufficient storm water drainage, as well as consequential damage to non-defective building components. (Compl. ¶ 36, ECF No. 1-1.)  Pursuant to the Homeowner Contracts, these construction-related disputes should be submitted to binding, bilateral arbitration.[1]

Separately, D.R. Horton contracted with Crossclaim Defendants and Third-Party Defendants  Alpha Omega Construction Group, LLC; Cannady Siding & Gutter, Inc.; Long Heating & Air Conditioning, Inc.; L&M Electric, Inc.; M&L Reyna Construction, LLC; P&L Enterprises, LLC; Damian Magos Mendoza; General Shale Brick, Inc.; Meridian Brick, LLC; Rite Rug Co.; Builders First Source – Southeast Group, LLC; Brand Vaughan Lumber Co.; Valmen Solutions, LLC; Bravo Carpenters, LLC; CJ Framing, LLC; Get Floored, LLC; Lansing Building Products, LLC; American Concrete and Precast, LLC; Five Star Foundations, LLC; One Tree Hill,

---

[1] D.R. Horton anticipates that Plaintiffs will argue that, should the Court compel arbitration, Plaintiffs be allowed to do so as a class.  Therefore, D.R. Horton preemptively addresses those arguments below. *See infra* Part VI.

Inc. d/b/a Willis Landscaping; The Loving Group, LLC; All In One Insulation, LLC; Marlowe Environmental, LLC; Kings Landscaping, LLC; Earthworks Unlimited, LLC; CSI Erosion, Inc.; CSI Erosion, SC, Inc.; Superior Grading, LLC; Cedar Ridge Landscaping, LLC; Dupree Plumbing Company, Inc.; A-Z, Inc.; Installed Building Products, LLC d/b/a Custom Glass Atlanta; Saldana Brothers, Inc.; 84 Lumber Company; Carter Lumber Company; Justin Villines, LLC; GBS Building Supply US LBM, LLC; Garcia Painting & Drywall, LLC; UTM Enterprises, Inc.; McGillicuddy Concrete, LLC; and Bianchi & Company, Inc. (collectively, "Subcontractors") to perform various work on the Homes. D.R. Horton has filed Crossclaims and Third-Party Claims against Subcontractors related to their work.

D.R. Horton entered into Independent Contractor Agreements (the "ICAs") with Subcontractors. The ICAs provide for the arbitration of disputes. The ICA arbitration provisions are substantially the same, and the majority state the following:

> 13.1 Disputes. All disputes, whether existing now or arising in the future between them, related in any way to this Agreement, to Contractor's Work, or to any dispute that Owner or Contractor shall have with any third party related to the Work ("Disputes") shall be subject to Alternative Dispute Resolution. These disputes shall include claims related to the construction or sale of any home or property incorporating the Work, including any claims asserting any alleged defects in the Work or any alleged representations and/or warranties, express or implied, relating to the property and/or the improvements…

> 13.3 Arbitration. If the parties are unable to resolve any Dispute by agreement, regardless of any other choice of law provision in any underlying contract or this Agreement, the Dispute shall be submitted to binding arbitration under the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"). All demands for arbitration shall be made before the expiration of the applicable statute of limitations or repose, except that any claim by Owner shall not accrue for purposes of any time limitation for claims until Owner has discovered the claim, or could have discovered it by reasonable diligence. The award rendered by the arbitrator(s) shall be final and binding. A petition to confirm, vacate, modify or correct an award may be filed in any court of competent jurisdiction, but the award may be vacated, modified or corrected only as permitted by the FAA.

(*E.g.*, Get Floored, LLC ICA §§ 13.1, 13.3, attached hereto as **Exhibit E**.)[2]

Therefore, the Homeowner Contracts and the ICAs require the parties to arbitrate their disputes. Numerous courts, including the United States District Court for the District of South Carolina, have recently granted motions to compel arbitration under similar circumstances.[3] The Court should follow suit and submit this matter to binding arbitration between D.R. Horton, Subcontractors, and Plaintiffs.

## LEGAL STANDARD

The Federal Arbitration Act (the "FAA") provides that legal proceedings must be stayed when any such issues in the suit are "referrable to arbitration under an agreement in writing." 9 U.S.C. § 3. "The FAA requires courts to stay a proceeding, pending arbitration, if the court determines that a valid arbitration agreement exists, and that the claims alleged fall within the scope of the arbitration agreement." *LaPoint v. John Wieland Homes & Neighborhoods of the Carolinas, Inc.,* C/A No. 0:08-3553-CMC, 2009 U.S. Dist. LEXIS 146577, at *4, 2009 WL 10684895 (D.S.C. Dec. 1, 2009) (citing *United States v. Bankers Ins. Co.,* 245 F.3d 315, 319 (4th Cir. 2001); *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)). "Once these criteria are met, the district court has 'no choice but to grant a motion to compel arbitration.'" *Id.* (quoting *Adkins v. Labor Ready, Inc*., 303 F.3d 496, 500 (4th Cir. 2002)).

When analyzing arbitrability, the "court must first determine whether the parties' agreement is governed by the FAA." *Bernstein v. Pulte Home Co.,* No. 0:19-cv-02805-JFA, 2019 U.S. Dist. LEXIS 227884, at *6 (D.S.C. Dec. 23, 2019). "A party can compel arbitration under

---

[2] Although some ICAs have slightly different arbitration provisions, they all lead to the same conclusion: these disputes must be submitted to binding arbitration.

[3] D.R. Horton discusses these cases in detail below. *See infra* Part IV.

the FAA by establishing (1) a dispute between the parties; (2) a written agreement that includes an arbitration provision purporting to cover that dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect or refusal of the opposing party to arbitrate the dispute." *Id.* When considering the scope of an arbitration provision under the FAA, "any doubts . . . are resolved in favor of arbitration." *Id.*

After determining that the FAA applies, "courts must apply state law to decide issues of contract formation" when a party challenges the enforceability of the arbitration agreement. *LaPoint*, 2009 U.S. Dist. LEXIS 146577, at *10. "The FAA recognizes arbitration agreements 'may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Sanders v. Savannah Highway Auto. Co.,* 2023 S.C. LEXIS 154, 892 S.E.2d 112, 115 (S.C. 2023) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010)). However, the FAA "preempt[s] any state law that completely invalidates the parties' agreement to arbitrate." *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 592, 553 S.E.2d 110, 116 (2001).

Moreover, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Id.* at 596, 553 S.E.2d at 118. A court may consider challenges to the arbitration clause itself, but any challenge to the contract as a whole should only be resolved by an arbitrator. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

## ARGUMENT

### I.    The Homeowner Contracts and ICAs Are Governed by the FAA.

The Homeowner Contracts and ICAs satisfy all four factors courts analyze to determine whether an arbitration provision is governed by the FAA:

(1) a dispute between the parties; (2) a written agreement that includes an arbitration provision purporting to cover that dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect or refusal of the opposing party to arbitrate the dispute.

*Bernstein*, 2019 U.S. Dist. LEXIS 227884, at *6.

**(a) Dispute Between the Parties**

Plaintiffs Wyatt and Iwinski entered into their respective Homeowner Contracts for the construction and sale of their Homes. (*See* Wyatt Contract; Iwinski Contract.) Plaintiffs Williams and Smith purchased their respective Homes from parties who entered contracts with D.R. Horton containing an arbitration clause, (*see* Pickens Contract; Bianchi Contract), and as subsequent purchasers are also subject to the arbitration provision. *See infra* Part V. Plaintiffs now complain of defects in the construction of the Homes and related issues. (*See generally* Compl. ¶¶ 28–43, ECF No. 1-1.) D.R. Horton has requested that Plaintiffs arbitrate this matter, but Plaintiffs have opposed D.R. Horton's attempts to arbitrate.

Subcontractors entered into the ICAs with D.R. Horton. Now, a dispute has arisen between Subcontractors and D.R. Horton related to the work performed and materials provided by Subcontractors. D.R. Horton has requested arbitration of this matter, but not all Subcontractors have appeared in this action or agreed to arbitrate.

**(b) Written Agreement Including Arbitration Provision**

The Homeowner Contracts' mandatory arbitration provision expressly covers disputes related to alleged defects in the development and construction of the Homes:

> **MANDATORY BINDING ARBITRATION.** PURCHASER AND SELLER SHALL SUBMIT TO BINDING ARBITRATION ANY AND ALL DISPUTES WHICH MAY ARISE BETWEEN THEM REGARDING THIS AGREEMENT AND/OR THE PROPERTY, INCLUDING BUT NOT LIMITED TO ANY DISPUTES REGARDING: (A) SELLER'S CONSTRUCTION AND DELIVERY OF THE HOME . . . .

(*E.g.*, Iwinski Contract § 15.)

The ICAs' mandatory arbitration provision also expressly covers this dispute, as it extends to "[a]ll disputes . . . related in any way to th[e] [ICA], to Contractor's Work, or to any dispute that Owner or Contractor shall have with any third party related to the Work." (Get Floored, LLC ICA § 13.1.)

Where an arbitration clause, like the ones in this case, provides for the arbitration of "any and all disputes which may arise" between the parties, courts will construe the arbitration clause broadly. *Landers v. FDIC*, 402 S.C. 100, 109-10, 739 S.E.2d 209, 213-14 (2013); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 398 (1967) (describing an arbitration clause as "broad" where the clause provided that "[a]ny controversy or claim arising out of or relating to . . . [the] Agreement . . . shall be settled by arbitration"). The Supreme Court of the United States, the Fourth Circuit Court of Appeals, and the South Carolina Supreme Court have found broad arbitration clauses to be "capable of an expansive reach." *See Prima Paint*, 388 U.S. at 398; *Am. Recovery Corp v. Computerized Thermal Imaging,* 96 F.3d 88, 93 (4th Cir. 1996); *Landers*, 402 S.C. at 109-10, 739 S.E.2d at 213-14.

As such, the language of a broad arbitration clause will apply where there is a "significant relationship" between the claims or disputes and the contract which contains the arbitration clause. *Am. Recovery Corp.,* 96 F.3d at 93. The arbitration clause will in no way be limited "to the literal interpretation or performance of the contract," but instead will "embrace[] every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 321 (4th Cir. 1988); *see also Landers,* 402 S.C. at 111, 739 S.E.2d at 214 ("[U]nder the expansive reach of the FAA a

tort claim need not raise an issue that requires reference to or the construction of some portion of the contract in order to be encompassed by a broadly-worded arbitration clause.").

Accordingly, Plaintiffs' alleged defects in the development and construction of the Homes fall squarely within the Homeowner Contracts' arbitration provision, and D.R. Horton's claims against Subcontractors related to their work fall squarely within the ICAs' arbitration provision.

**(c) Transactions Involving Interstate Commerce**

The only remaining factor to analyze is whether the transactions involve interstate commerce. The Homeowner Contracts were for the construction and/or purchase of new homes, with multiple options available for selection before, during, and after construction. (*See, e.g.*, Iwinski Contract at Ex. B (listing three pages of optional features selected by Plaintiff Iwinski.) The ICAs are contracts for Subcontractors' work in constructing those new homes. (*See* Get Floored, LLC ICA.) Therefore, as discussed below, all of the contracts are subject to the FAA.

The FAA applies to any written agreement to arbitrate in a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Courts have interpreted "the words 'involving commerce' [as] the functional equivalent of 'affecting commerce,' which typically indicates Congress' intent to exercise its commerce power in full." *Zabinski*, 346 S.C. at 591, 553 S.E.2d at 115. Congressional authority in this area is incredibly broad, as "case law firmly establishes Congress' power to regulate [even] purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005). Therefore, a dispute is subject to the FAA where there is a written agreement to arbitrate that encompasses it and the transaction at issue relates to or affects foreign or interstate commerce. *See, e.g.*, *Bernstein*, 2019 U.S. Dist. LEXIS 227884, at *6 (describing when a party can compel arbitration under the FAA).

The South Carolina Supreme Court has repeatedly held that an agreement for the construction of a new home built to a party's specifications "manifestly involve[s] interstate commerce." *Damico v. Lennar Carolinas, LLC*, 437 S.C. 596, 608, 879 S.E.2d 746, 753 (2022). A party could not construct a new home "with materials, equipment and supplies all produced and manufactured solely within the State of South Carolina." *Episcopal Hous. Corp. v. Fed. Ins. Co.*, 269 S.C. 631, 640, 239 S.E.2d 647, 652 (1977).

The Homeowner Contracts clearly cover both the construction and the sale of the Homes. The Homeowner Contracts contain an Addendum 2 that addresses the status of construction. (*See, e.g.*, Wyatt Contract § 25(a).) Addendum 2 to the Iwinski Contract is entitled "Construction in Progress," (Iwinski Contract add. 2); Addendum 2 to the Bianchi Contract is entitled "New Construction," (Bianchi Contract add. 2). Meanwhile, the Wyatt Contract contains both versions of Addendum 2. (Wyatt Contract at 20, 22.) These addenda plainly contemplate the future or ongoing construction of the Homes, to be completed prior to closing.

Moreover, although Addendum 2 to the Pickens Contract is labeled "Completed Construction," (Pickens Contract add. 2), the purchaser could nonetheless request certain changes (*see id.* ¶ 2). An exhibit, entitled "Stages of Construction," identifies those changes to the Home the purchaser could still request before closing. (Pickens Contract at Ex. D § 2.)

In addition, Addendum 9 to the Homeowner Contracts, "Variations in Materials and Components," contains a list of materials used to construct the Homes. (*E.g.*, Pickens Contract add. 9.) Use of those materials inevitably required interstate commerce. *See generally Episcopal Hous. Corp.,* 269 S.C. at 640, 239 S.E.2d at 652 ("It would be virtually impossible to construct an eighteen (18) story apartment building . . . with materials, equipment and supplies all produced and manufactured solely within the State of South Carolina.").

Indeed, to develop Rivermill, D.R. Horton sourced materials from out-of-state manufacturers and distributors such as Brand Vaughan Lumber Co. (Georgia), Electrolux Appliances (North Carolina), and Carrier HVAC Equipment (Florida). (Aff. Marcus Cannon ¶ 8 (Jan. 23, 2026), attached hereto as **Exhibit F**.) Various Rivermill subcontractors were also based outside of South Carolina, including, for example, Rite Rug, Co. (Ohio), Bravo Carpenters, Inc. (North Carolina), and Marlowe Environmental, LLC (Georgia). (*Id.* ¶ 9.) Subcontractors provided this out-of-state material and labor pursuant to the ICAs; therefore, the ICAs likewise involve interstate commerce.

Accordingly, the transactions at issue here fall within the FAA and arbitration must be compelled unless there are common law contract defenses that prevent such enforcement.

## II.     The Arbitration Provisions Are Enforceable.

The arbitration clauses in the Homeowner Contracts and ICAs, are enforceable because there are no general contract defenses that would invalidate the agreements to arbitrate.

After determining that the FAA applies, "courts must apply state law to decide issues of contract formation" when a party challenges the enforceability of the arbitration agreement. *LaPoint*, 2009 U.S. Dist. LEXIS 146577, at *10. "The FAA recognizes arbitration agreements 'may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Sanders*, 2023 S.C. LEXIS 154, 892 S.E.2d at 115 (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010)).

### a. The Arbitration Provision in the Homeowner Contracts Consists Only of Section 15.

Under what is known as the *Prima Paint* doctrine, "the first task of a court is to separate the arbitration provision from the rest of the contract." *Doe v. TCSC, LLC*, 430 S.C. 602, 607, 846 S.E.2d 874, 876 (Ct. App. 2020). A court can consider only "challenges specifically [to] the

validity of the agreement to arbitrate." *Rent-A-Ctr.*, 561 U.S. at 70 (citation omitted). "[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Id.* In other words, "a party must allege that the *arbitration agreement* is unconscionable, not that the *entire contract* is unconscionable." *Smith v. D.R. Horton, Inc.*, 417 S.C. 42, 48, 790 S.E.2d 1, 4 (2016).

In *Smith*, the South Carolina Supreme Court reviewed a paragraph called "Warranties and Dispute Resolution," with "more than 1,800 words" and "ten separately denominated subparagraphs." 417 S.C. at 53, 60, 790 S.E.2d at 6, 10 (Kittredge, J., dissenting). Subparagraph (g) was specifically identified as "MANDATORY BINDING ARBITRATION" and detailed the parties' obligation to arbitrate their disputes. *Id.* at 57–58, 790 S.E.2d at 9. Notably, the agreement did not contain a severability clause. *Id.* at 50 n.6, 790 S.E.2d at 5 n.6 (majority opinion).

The parties, and the justices, in *Smith* disagreed as to whether the ten subparagraphs should be read together as the "arbitration agreement," or only the specifically labeled arbitration subparagraph (g). *Id* at 48, 790 S.E.2d at 4. The majority concluded that "[t]he subparagraphs . . . contain[ed] numerous cross-references to one another" and therefore were "intertwin[ed] . . so as to constitute a single provision." *Id.* In a 3–2 decision, the court held that warranty disclaimers and damages limitations in various subparagraphs rendered the arbitration agreement unenforceable. *Id.* at 50, 790 S.E.2d at 5. Justice Kittredge filed a lengthy dissent, in which he noted that the plaintiffs "[did] not contend the specific agreement to arbitrate was unconscionable," and criticized the majority for relying on "the fiction that the arbitration provision [was] the entirety of Paragraph 14." *Id.* at 53, 59, 790 S.E.2d at 6, 10 (Kittredge, J., dissenting).

In *Damico*, the court addressed a contract with "ten, numbered paragraphs setting forth the arbitration agreement" in a section called "Mediation/Arbitration of Disputes." 437 S.C. at 605,

Page **13** of **14**

879 S.E.2d at 751.  The trial court held that the arbitration agreement "consisted of the entirety of the purchase and sale agreement and the [associated] limited warranty booklet" because "extensive cross-references between the two contracts combined them into a single agreement."  *Id.* at 606–07, 879 S.E.2d at 752.  The court of appeals reversed, finding that "the arbitration agreement . . . was contained in a distinct, separate section of the [contract]" and "the circuit court erred by considering the contract as a whole."  *Damico v. Lennar Carolinas, LLC*, 430 S.C. 188, 198–99, 844 S.E.2d 66, 72 (Ct. App. 2020), *rev'd on other grounds*, 437 S.C. 596, 879 S.E.2d 746 (2022). The South Carolina Supreme Court affirmed the appellate court on that ground, concluding that the section with the arbitration agreement was a standalone provision that "deal[t] solely with the scope of arbitration and the requisite formalities accompanying an arbitration proceeding." *Damico*, 437 S.C. at 610, 879 S.E.2d at 754.  Moreover, because the arbitration agreements in both the contract and the related warranty booklet were standalone provisions, in their own sections, "it [was] legally irrelevant that the portions of the contracts outside of the arbitration agreements extensively cross-reference[d] one another and incorporate[d] one another by reference."  *Id.* at 610 n.6, 879 S.E.2d at 754 n.6.

The court of appeals acknowledged this standard in *Mart v. Great Southern Homes, Inc.*, 441 S.C. 304, 893 S.E.2d 360 (Ct. App. 2023).  *Mart* involved an arbitration provision "in an unnumbered, standalone paragraph." *Id.* at 307, 893 S.E.2d at 361.  Other unnumbered paragraphs included a limited warranty that disclaimed all other warranties, as well as liability for consequential and punitive damages. *Id.* at 308, 893 S.E.2d at 362.  The buyer "agree[d] to accept [the] limited warranty in lieu of all other rights or remedies, whether base[d] on contract or tort." *Id.* (third alteration in original) (emphasis removed).  At closing, the buyer was provided with a warranty application and warranty that contained its own arbitration provision, and which likewise

disclaimed all other warranties and precluded recovery of incidental and consequential damages. *Id.* at 309–11, 893 S.E.2d at 363. On appeal, the court of appeals considered whether the trial court erred by incorporating provisions from this separate limited warranty into the parties' sales contract. *Id.* at 312, 893 S.E.2d at 364.

The *Mart* court looked to the South Carolina Supreme Court's conclusion in *Damico* that "'the circuit court impermissibly considered the terms found in the limited warranty booklet' when analyzing the arbitration provision of the purchase and sales agreement." *Id.* at 315, 893 S.E.2d at 365 (quoting *Damico*, 437 S.C. at 607, 879 S.E.2d at 753). The court added that "controlling case law [did] not permit [it] to consider the language of the separate limited Warranty or the propriety of the waiver of implied warranties in analyzing the standalone arbitration language of the Sales Contract." *Id.* at 315, 893 S.E.2d at 365. To demonstrate that the arbitration provision was unconscionable and, therefore, unenforceable, the plaintiff "was required to show that the language *in the arbitration section alone* was unconscionable." *Id.* at 315–16, 893 S.E.2d at 366 (emphasis added). The plaintiff failed to do that because although "[c]hallenged terms [could] be found elsewhere in the Sales Contract and/or the Warranty agreement," the arbitration provision itself "contain[ed] no such . . . term[s]." *Id.* at 315, 893 S.E.2d at 365.

*Damico* and *Mart* are consistent with the United States Supreme Court's holding in *Rent-A-Center*, where a company sought to enforce a delegation provision that gave the arbitrator "exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of th[e] Agreement." *Rent-A-Ctr.*, 561 U.S. at 66 (citation omitted). Notably, "the underlying contract [was] itself an arbitration agreement" entitled "Mutual Agreement to Arbitrate Claims." *Id.* at 65, 72. The *Rent-A-Center* Court clarified that "[a]pplication of the severability rule [of *Prima Paint*] does not depend on the substance of the

remainder of the contract." *Id.* at 72. No matter the underlying contract, when ruling on arbitrability a court can consider only challenges *specifically* to the provision providing for arbitration. *Id.* The *Rent-A-Center* plaintiff's unconscionability arguments—that the agreement "was one-sided" and contained a "fee-splitting arrangement" and "limitations on discovery"— were directed at the arbitration agreement *as a whole. Id.* at 73–74. The plaintiff "did not make any arguments *specific to the delegation provision*" or "contest the validity of *the delegation provision in particular*." *Id.* at 74 (emphasis added). *Rent-A-Center* makes clear that this is what the law requires.

In this case, the Homeowner Contracts bear more in common with the separate arbitration provisions in *Damico* and *Mart* than the combined warranty and dispute resolution paragraph in *Smith*. As in *Rent-A-Center*, here the arbitration clause is a standalone provision located in section 15 of the Homeowner Contracts, whereas warranties and related disclaimers are in section 14. Plaintiffs may argue that section 15 "incorporates" the warranty and disclaimer provisions of section 14. However, the arbitration provision in *Damico* stated that it applied to "any Dispute," including claims "arising by virtue of any . . . warranties alleged to have been made." 437 S.C. at 605, 879 S.E.2d at 751–52 (ellipsis in original). Nevertheless, as noted above, both the court of appeals and the South Carolina Supreme Court concluded that the arbitration agreement was a standalone provision that must be interpreted on its own—despite its reference to warranties and the existence of an outside limited warranty booklet. *Id.* at 607, 879 S.E.2d at 752–53.

Similarly, the arbitration agreement in *Mart* applied to "[a]ny dispute between the parties . . . arising out of [the] contract." 441 S.C. at 307, 893 S.E.2d at 361. "Any dispute" is broad enough to encompass warranty claims, which that agreement addressed (*and severely restricted*) shortly before the arbitration provision. *Id.* at 308, 893 S.E.2d at 362. Nonetheless, the

Page **16** of **17**

court of appeals refused to read these terms into the arbitration provision. *See id.* at 315–16, 893 S.E.2d at 366.

Under "federal law, the relevant arbitration provision consists of only that portion of [section 15] in which the parties agree[d] to arbitrate any controversies." *Smith*, 417 S.C. at 62, 790 S.E.2d at 11 (Kittredge, J., dissenting); *see also Prima Paint Corp.*, 388 U.S. at 404 (holding that when ruling on arbitrability, a court "may consider only issues relating to the making and performance of the agreement to arbitrate"). The arbitration provision in both *Damico* and *Mart* referred to warranty claims; the arbitration provision in *Damico* did so explicitly. Nonetheless, in both cases courts concluded that it was improper to read the terms of the warranty into the arbitration provision. In this case, the relevant arbitration provision as to Plaintiffs consists of the stipulation in section 15 of the Homeowner Contracts that the "purchaser and seller shall submit to binding arbitration any and all disputes which may arise between them regarding th[e] agreement and/or the property." (*E.g.*, Wyatt Contract § 15 (capitalization altered).) The Court should follow *Damico* and *Mart* and refuse to read extraneous provisions into a standalone, unchallenged arbitration provision. Plaintiffs' challenges to those other provisions in the Homeowner Contracts are "for the arbitrator." *Rent-A-Ctr.*, 561 U.S at 72.

Moreover, section 15 is severable from the rest of the Homeowner Contracts. *See Buckeye Check Cashing*, 546 U.S. at 445 ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."). "A severable contract is one . . . susceptible of division and apportionment, having two or more parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, nor is it intended by the parties that they shall be." *Columbia Architectural Grp., Inc. v. Barker*, 274 S.C. 639, 641, 266 S.E.2d 428, 429 (1980) (citation omitted). On the other hand, a contract should be

treated as a single, integrated agreement "when by its terms, nature, and purpose it contemplates and intends that each and all of its parts, material provisions, and the consideration are common each to the other and interdependent." *Id.* (citation omitted).  Whether or not a contract is severable "depends primarily upon the intent of the parties." *Id.* (citation omitted).

Here, the evidence suggests that the parties intended to treat section 15 as separate from the rest of the Homeowner Contracts.  Plaintiffs "separately initialed [section 15] titled 'MANDATORY BINDING ARBITRATION,'" which "indicates the parties themselves viewed these terms as distinct contractual provisions to which they separately consented." *Smith*, 417 S.C. at 61, 790 S.E.2d at 11 (Kittredge, J., dissenting).  In short, the arbitration provision is not combined with the warranty provision such that the two cannot be separated easily.  The Court should adhere to the parties' intentions and treat section 15 as a separate, distinct provision.

### b.  The Arbitration Provisions Are Not Unconscionable.

The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also* S.C. Code Ann. § 15-48-10(a).  Therefore, "courts may invalidate arbitration agreements on general state law contract defenses, such as fraud, duress, and unconscionability." *One Belle Hall Prop. Owners Ass'n v. Trammell Crow Residential Co.*, 418 S.C. 51, 60, 791 S.E.2d 286, 291 (Ct. App. 2016) (citation and internal quotation marks omitted).  However, neither the Homeowner Contracts' arbitration provision nor the ICAs' arbitration provision is unconscionable.

"In South Carolina, unconscionability is defined as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept

them." *Smith,* 417 S.C. at 49, 790 S.E.2d at 4 (quoting *Simpson v. MSA of Myrtle Beach, Inc.,* 373 S.C. 14, 24-25, 644 S.E.2d 663, 668 (2007)).  Inequity of bargaining power is not "on its own, sufficient basis to invalidate an arbitration agreement." *LaPoint,* 2009 U.S. Dist. LEXIS 146577, at *11 (citing *Munoz v. Green Tree Fin. Corp.,* 343 S.C. 531, 541, 542 n.5, S.E.2d 360, 365 n.5 (2001)).  "In conducting an unconscionability inquiry, courts may only consider the provisions of the arbitration agreement itself, and not those of the whole contract." *Smith,* 417 S.C. at 48, 790 S.E.2d at 4.

The touchstone of the analysis begins with the presence or absence of meaningful choice." *Damico*, 437 S.C. at 612, 879 S.E.2d at 755.  This requires courts to "consider, among all facts and circumstances, the relative disparity in the parties' bargaining power, the parties' relative sophistication, and whether the plaintiffs are a substantial business concern of the defendant." *Id.* at 613, 879 S.E.2d at 755.

When analyzing conscionability in the context of arbitration agreements, "the Fourth Circuit has instructed courts to focus generally on whether the arbitration clause is geared towards achieving an unbiased decision by a neutral decision-maker." *Simpson*, 373 S.C. at 25, 644 S.E.2d at 668.  That is the "general rubric" a court must use to "determine whether a contract provision is unconscionable due to both an absence of meaningful choice and oppressive, one-sided terms." *Id.* at 25, 644 S.E.2d at 669.  However, "there is no specific set of factual circumstances establishing the line which must be crossed when evaluating an arbitration clause for unconscionability." *Id.* at 36, 644 S.E.2d at 674.  Rather, courts should examine arbitration clauses for conscionability on a "case-by-case" basis. *Id.*

Here, the arbitration provision in the Homeowner Contracts is a far cry from provisions that courts have found to be unconscionable.  "On the rare occasion when a court has determined

that arbitral procedures render an arbitration agreement unenforceable, the one-sided provisions have been so pervasive and extreme that the arbitration provision created a 'sham system unworthy even of the name of arbitration.'" *LaPoint*, 2009 U.S. Dist. LEXIS 146577, at \*18–19 (quoting *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999)). For example, in *Damico*, the court concluded that the arbitration agreement was unconscionable because it gave the homebuilder too much control over the *process* of arbitration: findings would not be binding in other proceedings without mutuality of parties, which the homebuilder had unilateral power to prevent because only the homebuilder could join contractors and other third parties. 437 S.C. at 615–16, 879 S.E.2d at 757. Recently, in *Huskins v. Mungo Homes, LLC*, the South Carolina Supreme Court declared that a provision in an arbitration agreement purporting to shorten the statute of limitations was "void and illegal as a matter of public policy." 444 S.C. 592, 595, 910 S.E.2d 474, 476 (2024), *reh'g denied*, 2025 S.C. LEXIS 17 (Jan. 16, 2025).

In contrast, the arbitration provision in the Homeowner Contracts easily satisfies the fairness standard discussed above. In relevant part, the arbitration provision (1) binds both D.R. Horton and Plaintiffs to arbitrate construction defect disputes; (2) provides for arbitration in Plaintiffs' home county; (3) provides for American Arbitration Association ("AAA")[4] rules and an expedited hearing schedule; (4) gives the arbitrator discretion to assess the filing fees and costs against D.R. Horton; and (5) allows any party to seek judicial enforcement of the arbitrator's decision. There is nothing "so oppressive" about these terms such "that no reasonable person would make them and no fair and honest person would accept them." *Simpson*, 373 S.C. at 25,

---

[4] The AAA is a "well-known arbitration forum[]" that courts have recognized as "consumer friendly and affordable." *Whitman v. Legal Helpers Debt Resolution, LLC*, No.: 4:12-cv-00144-RBH, 2012 U.S. Dist. LEXIS 176480, at \*8 (D.S.C. Dec. 13, 2012) (citation omitted).

644 S.E.2d at 668.  On the contrary, these are reasonable and customary terms in an arbitration agreement and should be enforced.[5]

The analysis as to the ICAs is the same: (1) whether Subcontractors lacked a meaningful choice and the arbitration provision is one-sided; and (2) whether the terms of the arbitration provision "are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Smith*, 417 S.C. at 49, 790 S.E.2d at 4.  In the instance case, both questions must be answered in the negative.

First, Subcontractors had a meaningful choice to enter into the ICAs.  They are sophisticated parties who freely chose to establish a business relationship with D.R. Horton, by which Subcontractors have performed hundreds of thousands of dollars of work for D.R. Horton.  Subcontractors had the opportunity to negotiate terms and freely chose to assent to D.R. Horton's contractual terms, including the arbitration provision.  There was nothing unfair or one-sided about this bargaining process.

Second, the terms of the arbitration provision are not "so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Smith,* 417 S.C. at 49, 790 S.E.2d at 4.  The arbitration provision binds D.R. Horton and Subcontractors to arbitrate disputes and does not contain any oppressive terms.  There is nothing about the terms such that no fair and honest person would accept them.  The parties freely agreed to these terms in the ICAs, which are reasonable, customary, and should be enforced.

### a.  The Arbitration Provisions Are Fair and Mutuality Is Not Required.

---

[5] Moreover, because the Homeowner Contracts contain a severability clause, (*e.g.*, Wyatt Contract § 23), to the extent the Court disagrees, it can sever any provisions it finds unconscionable.

Plaintiffs may argue that, in their view, the arbitration agreement lacks mutuality of remedies and limits the arbitrator's authority.  Neither provides a basis for denying D.R. Horton's motion.  Any limitations of liability are in separate provisions, not in the arbitration agreement.  Therefore, as discussed throughout this memorandum, Plaintiffs' challenge should be addressed to an arbitrator.

In addition, the provisions that allow certain actions to proceed in court have no bearing on this case.  One deals solely with earnest money and how it will be treated in the transaction.  (*See, e.g.*, Iwinski Contract § 4.)  The other addresses what happens if D.R. Horton does not complete construction of the Home.  (*See, e.g.*, *id.* § 16(f).)  Neither is relevant to the present dispute.

Regardless, even if taken at face value, the argument fails.  The South Carolina Supreme Court has recognized that "lack of mutuality of remedy in an arbitration agreement, on its own, does not make the arbitration agreement unconscionable."  *Simpson*, 373 S.C. at 31, 644 S.E.2d at 672; *see also Munoz*, 343 S.C. at 542, 542 S.E.2d at 365 (stating that "the doctrine of mutuality of remedy does not apply" to an arbitration agreement because the agreement "does not determine the *remedy* for a breach of contract but only the *forum* in which the remedy for the breach is determined" (emphasis altered)).

The court expressed concern about mutuality in *Damico* because the agreement gave the builder sole discretion to join third parties, such as contractors, while also mandating that findings in one proceeding could not be used in another unless there was mutuality of parties.  *Damico*, 437 S.C. at 615–16, 879 S.E.2d at 757.  The *Damico* court found that this violated the "fundamental principle of law that the plaintiff is the master of his own complaint."  *Id.* at 616, 879 S.E.2d at 757.  The *Damico* court also noted that it "create[d] the possibility of inconsistent factual findings that would preclude [homeowners] from recovery on a purely procedural (rather than a merit)

basis." *Id.* at 616, 879 S.E.2d at 757.  The court was concerned that builder's ability to control the proceedings created the possibility of parallel "empty chair" defenses, where an arbitration defendant could blame an absent party, while in court, a litigation defendant could blame the parties that submitted to arbitration.  *Id.*  Moreover, the court observed that because findings would not be binding in other proceedings without mutuality of parties, *which the homebuilder had unilateral power to prevent*, homeowners "could not even use the fact that the arbitrator had found [the builder] was not at fault when pursuing liability against the remaining circuit-court defendants, or vice versa."  *Id.*  It was this "procedural defense to liability" that the court found "wholly unreasonable and oppressive."  *Id.*

Similarly, in *Simpson*, the agreement allowed one party—car dealers—to "bring a judicial proceeding that completely disregard[ed] any pending consumer claims that require[d] arbitration."  *Simpson*, 373 S.C. at 31, 644 S.E.2d at 672

As now-Chief Justice Kittredge has noted, the yardstick of whether an agreement is unconscionable is even-handedness.  *Damico*, 437 S.C. at 614, 879 S.E.2d 756.  The agreement in *Damico* failed to meet that standard by creating a "procedural defense to liability" that was "wholly unreasonable and oppressive."  *Id.* at 616, 879 S.E.2d at 757.  Similarly, in *Simpson*, the agreement at issue effectively elevated "the dealer's judicial remedies" above "the consumer's arbitral remedies," creating a process that was "one-sided and oppressive and d[id] not promote a neutral and unbiased arbitral forum."  *Simpson*, 373 S.C. at 32, 644 S.E.2d at 672.  The arbitration provision in this case contains no such terms.

As noted above, the arbitration provision in the Homeowner Contracts requires D.R. Horton *and* homebuyers to arbitrate all construction-defect claims and allows any party to seek

judicial enforcement of an arbitration decision. (*See, e.g.*, Pickens Contract § 15.) There is no lack of mutuality in these provisions; even if there were, there is no unconscionability.

There is also nothing unconscionable about the arbitration procedures the agreement dictates or the limits it places on an arbitrator's authority. In *Hooters*, the court found that the promised employment arbitration was a "sham" because the company "was responsible for setting up . . . a [neutral] forum by promulgating arbitration rules and procedures," but instead established rules that were "so one-sided that their only possible purpose [was] to undermine the neutrality of the proceeding." *Hooters*, 173 F.3d at 938, 940. Among the rules' many problems, the company was "not required to file any responsive pleadings or to notice its defenses"; "the employee [had to] provide the company with a list of all fact witnesses with a brief summary of the facts known to each," but the company had no obligation to reciprocate; the company could expand the scope of arbitration "to any matter," whereas the employee was limited to the issues in the initial claim; the company had the right to record audio or video of the arbitration hearing, but the employee did not; and only the company could "bring suit in court to vacate or modify an arbitral award." *Id.* at 938–39. Moreover, two of the three arbitrators that would resolve any dispute had to be picked from a list *created by the company. See id.* The court concluded "that the promulgation of so many biased rules—*especially the scheme whereby one party to the proceeding so control[led] the arbitral panel*—breache[d] the contract entered into by the parties." *Id.* at 940 (emphasis added).

The Homeowner Contracts contain no such provisions. As noted above, the arbitration provision provides for arbitration before the AAA, a forum that is "well-known," "consumer friendly," and "affordable." *Whitman*, 2012 U.S. Dist. LEXIS 176480, at *8 (citation omitted). Moreover, the arbitration provision allows for either party to seek judicial enforcement of an

arbitration award.  (*E.g.*, Bianchi Contract § 15.)  These provisions are consistent with the goal of "achieving an unbiased decision by a neutral decision-maker."  *Simpson*, 373 S.C. at 25, 644 S.E.2d at 668.

The propriety of any other provisions should be determined by the arbitrator, as even the Fourth Circuit in *Hooters* recognized that "[g]enerally, objections to the nature of arbitral proceedings are for the arbitrator to decide in the first instance."  *Hooters*, 173 F.3d at 941.  The court undertook the review it did only because the company had a contractual duty to promulgate rules for arbitration and its "material breach of th[at] duty warranting rescission [was] an issue of substantive arbitrability and thus [was] reviewable before arbitration."  *Id.*  The court emphasized that the case was "the exception that proves the rule: *fairness objections should generally be made to the arbitrator*."  *Id.* (emphasis added).  Such extenuating circumstances do not exist in this case; "the rule" applies, and any questions about the conscionability or fairness of the Homeowner Contracts must be resolved in arbitration.

### III.    The Arbitration Provision Did Not Merge with the Deeds.

The merger-by-deed doctrine does not apply in the context of arbitration agreements in new-home sales contracts.  To the extent the doctrine is applicable, there are exceptions, two of which are relevant here.  Whether the Court concludes that the doctrine is not applicable in the first instance or determines that an exception applies, the result is the same: the provision did not merge.

#### a.  The Merger Doctrine Does Not Apply to the Arbitration Provision.

The merger by deed doctrine provides that "[t]he execution, delivery, and acceptance of a deed varying from the term of an antecedent contract indicates an amendment of the original contract, and generally the rights of the parties are fixed by their expressions as contained in the

deed." *Shoney's, Inc. v. Cooke*, 291 S.C. 307, 311, 353 S.E.2d 300, 303 (Ct. App. 1987) (quoting

*Charleston & Western Carolina Ry. Co. v. Joyce*, 231 S.C. 493, 99 S.E.2d 187, 193 (1957)). "'The

doctrine . . . is founded upon the privilege, which parties always possess, of changing their contract

obligations by further agreements prior to performance.'" *Id.* at 310, 353 S.E.2d at 303 (quoting

*Joyce*, 231 S.C. at 504, 99 S.E.2d at 193). In other words, as courts across the United States have

recognized, "the contract's promises . . . 'merge' into the deed's representations." *Bushman v. Inv.*

*Props., Ltd v. DBSI E-470 E. LLC*, No. 09-cv-00674-MSK-KLM, 2010 U.S. Dist. LEXIS 21011,

at *15, 2010 WL 582351 (D. Colo. Feb. 15, 2010).

Application of the doctrine is not always straightforward: it "is a complex legal doctrine

that has received disparate treatment from courts throughout South Carolina," which "recognizes

at least three broad exceptions to the doctrine." *Dudek v. Commonwealth Land Title Ins. Co.*, 466

F. Supp. 3d 610, 625 (D.S.C. 2020). Other courts have come closer to establishing a bright line

rule that the doctrine applies *only* to "covenants in [a] contract that relate to title, quantity,

possession, or emblements[6] of the land." *Bushman*, 2010 U.S. Dist. LEXIS 21011, at *15.

Otherwise, "agreements in the contract that do not relate to these subjects, which are not

necessarily satisfied by the execution and delivery of the deed, are not merged and remain

enforceable following delivery of the deed." *Id.* at *16.

Agreements to arbitrate are clearly outside the scope of obligations that merge with a deed,

as numerous courts—including a recent South Carolina circuit court decision—have so held. (*See*

Am. Order Rejecting Merger Argument, *Brunetti v. D.R. Horton, Inc.*, No. 2023-CP-08-02903

---

[6] Emblements" refers to crops that are produced annually, such as corn and wheat. Ballentine's
Law Dictionary (3d ed. 1969). In this context, it relates to the right of a (former) tenant to enter
onto land and harvest crops that the tenant planted earlier in the year. *See* Restatement (Fourth) of
Property § 2.5 (Tentative Draft).

(S.C. Ct. Com. Pl. filed Apr. 28, 2025), attached hereto as **Exhibit G**); *see also, e.g.*, *Bushman*, 2010 U.S. Dist. LEXIS 21011, at \*15–16; *Thomas v. Sloan Homes, LLC*, 81 So. 3d 309, 313–14 (Ala. 2011); *Dress Co. v. Osburg*, 144 S.W.3d 831, 832–33 (Ky. Ct. App. 2003); *Stanford Dev. Corp v. Stanford Condo. Owners Ass'n*, 285 S.W.3d 45, 51–52 (Tex. App. 2009). Notably none of these decisions depended upon the presence of express survival language in the arbitration provision.

In *Dress Co. v. Osburg*, the Kentucky Court of Appeals reviewed an agreement "for the construction and purchase of a new home with . . . a multi-state developer and builder of residential communities." *Dress Co.*, 144 S.W.3d at 832. When the purchasers later installed an above-ground pool, the builder/developer informed them that it violated restrictive covenants on the property. *Id.* The homeowners filed suit, claiming they had been misled about the covenants. *Id.* The builder moved to stay or dismiss and compel arbitration; the trial court denied the request on the basis the purchase agreement merged with the deed, which did not contain an arbitration provision. *Id.* The court of appeals reversed, noting that the arbitration provision "had nothing to do with the title, possession, quantity, or emblements of the property." *Id.* at 833. The court also hinted at the commonsense nature of this ruling because "disputes, after all, frequently arise after closing." *Id.* Therefore, "it is reasonable to suppose that the parties intended post-closing performance of [an arbitration] clause." *Id.*

In *Bushman*, the United States District Court for the District of Colorado similarly explained that merger does not apply to arbitration agreements in real estate contracts. *Bushman*, 2010 U.S. Dist. LEXIS 21011, at \*15–16. As the court noted, an "arbitration agreement is not a covenant relating to the title, quantity, possession, or emblements of the property itself; it is, quite

obviously, not an agreement that can be satisfied by execution and delivery of the deed." *Id.* at *16. Therefore, it does not merge with the deed and remains enforceable. *Id.*

The Alabama Supreme Court in *Thomas v. Sloan Homes, LLC*, analyzed the merger doctrine in the context of an arbitration agreement in a new residential home purchase agreement. *Thomas*, 81 So. 3d at 309–10. After closing, the purchasers received a general warranty deed that contained typical provisions, such as "a description of the property, a recitation of the purchase price, language of conveyance describing the nature of the estate conveyed, and covenants and warranties pertaining to the quality of title held by the grantor and conveyed to the grantees." *Id.* at 311. There was "no mention of the sales contract and [the deed] contained none of the other terms that were in the sales contract, including the arbitration clause." *Id.* The purchasers relied on that in seeking to avoid arbitration. *See id.* at 312.

The Alabama Supreme Court rejected that argument, noting the "limitation of the merger doctrine." *Id.* at 313. "The rational basis for the merger rule is that where parties enter into a final contract all prior negotiations, understandings and agreements *on the same subject* are merged into the final contract and are accordingly extinguished." *Id.* (emphasis added) (citation and internal quotation marks omitted). However, where a contract

> clearly provide[s] for agreements or stipulations to build or construct as well as an agreement to convey, it is plain that the actual transfer of the deed, which is performance only of the agreement to convey, does not extinguish any duties and obligations arising out of the agreement to build.

*Id.* (citation omitted). Therefore, "disputes regarding the manner and quality of the construction of the home" are "governed by the arbitration clause in the sales contract," which is "not altered by the delivery of an ordinary warranty deed and the conveyance of title accomplished thereby." *Id.* at 313–14.

Similarly, the Texas Court of Appeals in *Stanford Development Corp. v. Stanford Condominium Owners Ass'n*, analyzed an arbitration agreement and the merger argument in a construction-defect suit brought by a homeowners' association against a builder/developer. *Stanford Dev. Corp.*, 285 S.W.3d at 46–47. The builder moved to compel arbitration based on provisions in the homeowners' earnest money contracts. *Id.* at 47. The trial court expressed reservations as to whether the arbitration provision survived issuance of the deed. *Id.* at 51. The court of appeals clarified that "the merger doctrine *does not apply* to a deed that constitutes only partial performance of the preceding contract." *Id.* (emphasis added). Where an agreement for the sale of land creates rights and obligations unrelated to the transfer of land, such as for the completion of construction, those rights and obligations "survive[] a deed that is silent with respect to" them. *Id.* Therefore, the court of appeals held that the merger doctrine was "not applicable" because the arbitration provision "created rights independent of the conveyance, and, as such, were not merged out of existence by the subsequent deeds." *Id.* at 52.

The South Carolina Supreme Court applied similar reasoning in *New Prospect Area Fire District v. New Prospect Ruritan Club*, where a Ruritan Club deeded land to a fire district under the condition that the district would eventually deed the land back. *New Prospect*, 311 S.C. 402, 403, 429 S.E.2d 791, 792 (1993). Specifically, under the agreement the club would deed the lot to the fire district; the fire district could construct a building on the lot, for which the club would pay 40% of the construction costs, plus interest; when there was no loan or mortgage on the property, the fire district would return the lot to the club; and the fire district would retain the right to use the building for fire district purposes. *Id.* A dispute arose after the fire district terminated the club's use of the building for the club's monthly meetings. *Id.* at 404, 429 S.E.2d at 792. The trial court concluded that the "agreement d[id] not reserve a right of reverter because it was

'merged' in the subsequent deed." *Id.* The South Carolina Supreme Court reversed, stating that "[w]here a deed constitutes only part performance of a preceding contract, *other distinct and unperformed provisions of the contract are not merged* in the deed." *Id.* at 405, 429 S.E.2d at 792 (emphasis added). Therefore, the court held that the merger doctrine did not apply. *Id.*

The South Carolina trial court recently relied on this logic in *Brunetti*, where the court explicitly rejected the plaintiff's argument that an arbitration provision merged with the deed to her home. (Am. Order Rejecting Merger Argument, *Brunetti*, slip op. at 1–3.) As the court noted, "[t]he Homeowner Contract contains numerous rights and obligations unconnected to the transfer of the land, which remain unperformed and effective post-closing." *Id.* at 3. Therefore, the court concluded that the merger doctrine was inapplicable. *Id.* This Court should apply the same logic here and conclude that the arbitration provision did not merge, as it is not the type of agreement that is encompassed by the merger doctrine.

### b. An Exception to the Merger Doctrine Applies.

Even if the merger doctrine does apply to the arbitration provision, there are exceptions to its application in this instance. There are at least three exceptions to the merger rule. *See Dudek*, 466 F.Supp.3d at 624. The first exception, "mistake or fraud in the execution of the deed," *id.*, is not relevant here. The second exception is that "the party denying merger" can enforce the provisions of a pre-deed contract if it "prov[es] by clear and convincing evidence that merger was not intended." *Hughes v. Greenville Country Club*, 283 S.C. 448, 451, 322 S.E.2d 827, 828 (Ct. App. 1984). This is known as "the contrary intent exception to the merger doctrine." *Id.* at 450–51, 322 S.E.2d at 828.

In *Carlson v. S.C. State Plastering, LLC*, the South Carolina Court of Appeals applied this exception under facts similar to those in this case: plaintiff homeowners executed a purchase

agreement that included an arbitration clause; a deed was subsequently issued that did not provide for arbitration; and the plaintiffs brought claims alleging construction defects with their home. *Carlson*, 404 S.C. 250, 254, 743 S.E.2d 868, 870–71 (Ct. App. 2013). The plaintiffs argued that their claims were not subject to arbitration "because the deed, which contained no arbitration clause, superseded the purchase agreement." *Id.* at 260, 743 S.E.2d at 874. The court of appeals disagreed and found that survival language in the agreement provided "clear and convincing evidence" that "the parties did not intend for the arbitration clause to be superseded by the subsequently-executed deed." *Id.* at 261, 743 S.E.2d at 874.

Here, the Homeowner Contracts contain a number of provisions that similarly evince the parties' intent not to merge the terms of the Homeowner Contract with the deed. (*E.g.*, Pickens Contract §§ 14 (warranty), 15 (arbitration of *future* disputes regarding the agreement *and* the property), 18 (post-closing remedies).) Significantly, finding the merger doctrine applicable would mean that D.R. Horton's warranty obligations to purchasers merge out of existence at the very moment they become relevant, which the parties clearly could not have intended. *See Holmes v. Worthey*, 282 S.E.2d 919, 923 (Ga. Ct. App. 1981) (stating that where a contract contains "agreements or stipulations to build or construct *as well as* an agreement to convey, *it is plain* that the actual transfer of the deed, which is performance only of the agreement to convey does not extinguish any duties and obligations arising out of the agreement to build" and "*the intention of the parties ought not to be in question*" (second and third emphases added)), *aff'd*, 287 S.E.2d 9 (Ga. 1982); *cf. Dress Co.*, 144 S.W.3d at 833 (noting that "it is reasonable to suppose that the parties intended post-closing performance of [an arbitration] clause" because "disputes, after all, frequently arise after closing").

The third exception to the doctrine of merger is the "collateral agreement" exception. *See Dudek*, 466 F. Supp. 3d at 624. Under the collateral agreement exception, the party opposing merger must show "by clear and convincing evidence" that the agreement in question is "independent and distinct from the main contract," is "consistent with the provisions of the main contract," and is "such an agreement as the parties could not reasonably be expected to embody in the main contract but would naturally make as a separate agreement." *Shoney's*, 291 S.C. at 312, 353 S.E.2d at 304; *cf. New Prospect*, 311 S.C. at 405, 429 S.E.2d at 792 ("Where a deed constitutes only part performance of a preceding contract, other distinct and unperformed provisions of the contract are not merged in the deed.").

In the present case, the deed addressed only so much of the Homeowner Contracts as related to the sale and transfer of the underlying land; the deed does not cover any aspect of the construction of the Homes, post-closing dispute resolution, or warranties to be provided by D.R. Horton and the manufacturers. The arbitration provision is a separate agreement dealing solely with disputes under the Homeowner Contracts. It is also consistent with the Homeowner Contracts' terms. Finally, as discussed above, it is such an agreement as the parties could not reasonably have been expected to place into the deed. It is difficult to imagine a deed incorporating the language of an arbitration provision addressing home construction and warranty obligations. Indeed, the South Carolina Supreme Court has described as "absurd" and "grossly oppressive" a homebuilder's attempt to place an arbitration provision in the purchasers' deeds characterized "as an 'equitable servitude' that runs with the land in perpetuity." *Damico*, 437 S.C. at 617, 879 S.E.2ds at 758.

In sum, there is no authority, either in South Carolina or otherwise, that justifies the use of the merger doctrine to preclude arbitration in this case.

IV.     **Recent Federal District Court and South Carolina Circuit Court Opinions Have Enforced Substantively Identical Provisions.**

Over the past several months, multiple courts have granted motions to compel arbitration sought by D.R. Horton in matters similar to the instant case.  The U.S. District Court for the District of South Carolina recently became the first federal court in South Carolina to address the enforceability of the arbitration provision in D.R. Horton's contracts.  *Vriens v. Tip-Top Roofing & Constr., LLC*, No. 2:23-cv-06797-DCN (D.S.C. Sept. 4, 2025), attached hereto as **Exhibit H**.  Shortly thereafter, a South Carolina trial court granted D.R. Horton's motion to compel arbitration against homeowner plaintiffs in two cases.  *Ban v. D.R. Horton, Inc.*, No. 2025-CP-26-00526 (S.C. Ct. Com. Pl. Sept. 15, 2025), attached hereto as **Exhibit I**; *Prest v. D.R. Horton, Inc.*, No. 2025-CP-26-00484 (S.C. Ct. Com. Pl. Sept. 15, 2025), attached hereto as **Exhibit J**.  These courts were faced with the same issues present in this motion and, after a thorough and thoughtful analysis, found D.R. Horton's arbitration provision to be enforceable.[7]

Like Plaintiffs, the plaintiffs in *Vriens* are homeowners who brought construction-defect claims against D.R. Horton.  *Vriens*, slip op. at 3–4.  The plaintiffs refused to arbitrate pursuant to the terms of the arbitration provision in D.R. Horton's homeowner contracts; therefore, D.R. Horton moved to compel arbitration.  *Id.* at 7.  The arbitration provision in those contracts is substantially the same as the one in the Homeowner Contracts.  *See id.* at 5.

The plaintiffs objected to arbitration, "raising the defenses of unconscionability and unenforceability as a matter of law and public policy."  *Id.* at 14.  Specifically, the plaintiffs argued that the arbitration provision had to be viewed in conjunction with the separate warranty provision and it was "an adhesion contract with oppressive terms."  *Id.* at 15.  They further argued that

---

[7] As discussed below, these were hardly the first courts to grant a motion to compel arbitration filed by D.R. Horton.  *See infra* pp.36–37.

severance of those oppressive terms would violate public policy. *Id.*

The district court carefully considered and rejected those arguments. The court noted that its first task was to determine whether the FAA applied, which required the court to address four factors. *Id.* at 9–10. Two of those criteria—a dispute between the parties and a refusal to arbitrate—were easily met. *Id.* at 10, 13–14. The court also had no difficulty concluding that construction-defect disputes were subject to the arbitration provision in the relevant homeowner contracts. *Id.* at 10–11. Therefore, the court's discussion focused on whether the dispute related to interstate or foreign commerce. *See id.* at 11–13. The court concluded that it did, finding that the relevant contracts were for the construction of new homes, and new construction has been held to relate to interstate commerce. *Id.* at 12–13.

The court then recognized that under the FAA, its review was limited to the arbitration provision itself and that challenges to the contract as a whole should be addressed to an arbitrator. *Id.* at 14–15. Crucially, the court rejected the plaintiffs' invitation to "intertwine" the arbitration and warranty provisions. *See id.* at 16. Noting that the parties initialed each section separately, the court held that the arbitration agreement was "a standalone provision" that was "separately located from the warranties and related disclaimers" in the homeowner contract. *Id.* at 18.

With its review focused on the arbitration provision, the court found that it was "not unconscionable because [the plaintiffs] did not lack a meaningful choice and were not subject to oppressive terms." *Id.* at 17. As to the plaintiffs' choice, the court noted that they were not forced to buy a home from D.R. Horton. *See id.* at 17–18. As to the provision's terms, they were not "so oppressive . . . such that no fair and honest person would accept them." *Id.* at 18. The court noted that the arbitration provision was binding on both D.R. Horton and the plaintiffs, called for arbitration in the plaintiffs' home county and an expedited schedule, and allowed the arbitrator to

assess fees against D.R. Horton. *Id.* The court described those as "reasonable and customary terms" that were the result of "a fair bargaining process." *Id.* Therefore, the court held that the arbitration provision was "not unconscionable and should be enforced." *Id.*

The South Carolina trial court reached similar conclusions in *Ban* and *Prest*. As in *Vriens*, the court found that the arbitration agreement was subject to the FAA, *Ban*, slip op. at 6–8, and was a standalone provision located entirely in section 15 of the relevant contract that had to be interpreted on its own, *id.* at 12–13.[8] The court noted that the plaintiff separately initialed section 15, which was evidence the parties intended the provision to be severable from the rest of the contract. *Id.* at 13. Therefore, although the arbitration provision referenced section 14, with its warranties and disclaimers, the court refused to incorporate those terms into the arbitration agreement. *Id.* at 12– 13.

The court then considered whether the arbitration provision was unconscionable, focusing on whether it was drafted so as to achieve an unbiased decision by a neutral decision-maker. *Id.* at 14. Unconscionable arbitration provisions, the court noted, typically give one party excessive control over the arbitral process, to such an extent it is impossible to obtain a fair result. *Id.* at 15. In contrast, the court found that the arbitration provision in D.R. Horton's contract was fair because it bound both the plaintiff and D.R. Horton; provided for proceedings in the plaintiff's home county, before a neutral forum (the AAA) and with an expedited schedule; allowed the arbitrator to allocate fees; and allowed either party to seek judicial enforcement of the arbitrator's decision. *Id.* at 15–16. As in *Vriens*, the court described these terms as "reasonable and customary." *Id.* at 16.

The court also rejected the plaintiff's argument that "lack[] [of] mutuality of remedies and

---

[8] D.R. Horton cites only to *Ban*, but the *Prest* order is substantively identical.

limits [to] the arbitrator's authority" rendered the arbitration provision unenforceable. *Id.* at 17. The court found it irrelevant that the contract allowed certain claims to proceed in court while requiring the arbitration of others. *Id.* Nor was the arbitration provision unenforceable because *other provisions* of the contract purported to waive liability for certain damages. *Id.* The court noted that although the law will not enforce an agreement that allows one party's judicial remedies to *supersede* another's arbitral remedies, it does not require complete mutuality. *Id.* at 17–18. Instead, the law requires "even-handedness," *id.* at 18, so that the parties have a fair and neutral forum in which they can resolve their disputes, *id.* at 19–20. The court concluded that the arbitration provision provided just that and any other challenges to the contract, including to the supposed limits on the arbitrator's authority, were to be resolved in arbitration. *Id.* at 19–20.

These recent decisions, from both federal and state courts, provide a roadmap for the proper analysis of the arbitration provision in the Homeowner Contracts. The decision in *Vriens* is especially pertinent, as it marks the first federal court to analyze the arbitration provision.

The decisions in *Vriens*, *Ban*, and *Prest* are just the latest, however, in a string of decisions enforcing an arbitration provision in a D.R. Horton home purchase agreement. A South Carolina trial court previously did so in March 2024, in a putative class action construction defect case filed in Berkeley County. (Order Granting Mots. Compel Arbitration & Stay, *Tyler v. D.R. Horton, Inc.*, No. 2022-CP-08-02548 (S.C. Ct. Com. Pl. Mar. 4, 2024), attached hereto as **Exhibit K**.) The court compelled the plaintiffs to arbitration, specifically ruling that the merger doctrine did not apply and merge the arbitration clause out of existence. *Id.* at 3–5. The court confirmed that decision in an order denying the plaintiffs' motion to reconsider. (Order on Mot. Reconsider, *Tyler* (S.C. Ct. Com. Pl. June 24, 2024), attached hereto as **Exhibit L**.) This was followed by a decision in October 2024 compelling arbitration in a construction-defect case brought homeowners in

Richland County.  (Form 4 Order, *Hill v. D.R. Horton, Inc.*, No. 2024-CP-40-03666 (S.C. Ct. Com. Pl. Oct. 3, 2024), attached hereto as **Exhibit M**.)  That decision was likewise affirmed in an order denying the plaintiffs' motion to reconsider.  (Form 4 Order, *Hill* (S.C. Ct. Com. Pl. filed July 2, 2025), attached hereto as **Exhibit N**.)

**V.    The Pickens Contract and Bianchi Contract Bind Plaintiff Williams and Plaintiff Smith, Respectively.**

Although Plaintiff Williams and Plaintiff Smith are not signatories to the Homeowner Contracts for their homes, the arbitration provisions within the Homeowner Contracts is enforceable against them.  "The obligation and entitlement to arbitrate does not attach only to one who has personally signed [a] written arbitration provision."  *Wash. Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004) (citation and internal quotation marks omitted).  "Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties."  *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416–17 (4th Cir. 2000).  The Fourth Circuit has recognized a variety of theories under which a nonsignatory can be bound by an arbitration agreement, including "1) incorporation by references; 2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel."  *Id.* at 417 (citation omitted); *accord Wilson v. Willis*, 426 S.C. 326, 338, 827 S.E.2d 167, 174 (2019) (noting recognition of the same theories by South Carolina courts).

The theory of estoppel is particularly appropriate here.  "Equitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity."  *Int'l Paper*, 206 F.3d at 417–18 (citation and internal quotation marks omitted).  Whether the doctrine applies depends on what is "often referred to as the direct benefits test."  *Wilson*, 426 S.C. at 339, 827 S.E.2d at 174.  "In the arbitration

context," this means "that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." *Int'l Paper*, 206 F.3d at 418. Simply put, a plaintiff cannot have his cake and eat it, too.

Here, it appears that Plaintiffs attempted to frame their complaint to avoid any argument that subsequent purchasers are bound by purchase agreements to arbitrate their claims. Other courts have seen through such attempts at artful pleading, and this Court should do the same.

In *Dixon v. Pattee*, 442 S.C. 233, 898 S.E.2d 158 (Ct. App. 2023), the South Carolina Court of Appeals held that a non-signatory to an arbitration clause can be held subject to arbitration when it seeks benefits from a contract providing for arbitration. *Dixon*, 442 S.C. at 256–59, 898 S.E.2d at 170–72. As the court noted, a plaintiff "may not rely on [a] contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Id.* at 258, 898 S.E.2d at 171 (citation omitted). Therefore, when a plaintiff asserts a claim that arises *only by virtue of a contract*, he is estopped from avoiding the effect of the arbitration provision in that contract. *Id.*

In *Dixon*, the court held that while the plaintiffs were not parties or signatories to the relevant agreement, because they relied on the warranty that was contained in that agreement in bringing their claims, they were bound by the arbitration provision that was also in that agreement. *Id.* at 258–59, 898 S.E.2d at 171. Therefore, the court compelled arbitration of the nonsignatories' claims for (1) breach of express *and* implied warranties *and* (2) violation of the South Carolina Unfair Trade Practices Act. *Id.* at 247, 258–59, 898 S.E.2d at 165, 171–72.

Here, Plaintiffs allege that D.R. Horton owed Plaintiffs a duty to construct the Homes "in accordance with . . . permitted building plans." (Compl. ¶ 37, ECF No. 1-1.) Plaintiffs further allege that D.R. Horton had a duty to construct the Homes "in accordance with . . . approved plans

and specifications." (*Id.* ¶ 73.) Plaintiffs charge D.R. Horton with breaching this duty by "failing to use due care in designing and/or constructing the [Homes]" and "failing to design and/or construct the [Homes] in accordance with . . . approved plans, specifications, and details." (*Id.* ¶ 75(a), (c).) These plans, specifications, and details existed only by virtue of the Homeowner Contracts between D.R. Horton and the original purchasers, including the Pickens Contract and the Bianchi Contract. Without those contracts, there would be no such claims. Thus, it is clear that Plaintiff Williams and Plaintiff Smith, as well as all other putative class members who are subsequent purchasers, are seeking benefits from certain D.R. Horton contractual provisions while attempting to avoid arbitration.

Moreover, like the *Dixon* plaintiffs, Plaintiffs assert claims for breach of implied warranties and unfair trade practices. (*Id.* ¶¶ 80–93); *see Dixon*, 442 S.C. at 247, 898 S.E.2d at 165. The Court should likewise compel arbitration of *all* claims by *all* Plaintiffs. *See Dixon*, 442 S.C. at 258–59, 898 S.E.2d at 171–72.

At least one South Carolina trial court has reached a similar conclusion. *Tyler*, discussed *supra*, was a putative class action where the plaintiffs' claims included causes of action for negligence, breach of implied warranties, and unfair trade practices. (*See* Order Granting Mots. Compel Arbitration & Stay, *Tyler*, slip op. at 1–2.) The complaint identified one plaintiff as a subsequent purchaser and intended for him to represent that subclass. (*Tyler*, Second Am. Compl. ¶¶ 8–9, 42, attached hereto as **Exhibit O**.) Nonetheless, the court granted D.R. Horton's motion to stay and compel arbitration. (Order Granting Mots. Compel Arbitration & Stay, *Tyler*, slip op. at 5.) The court later confirmed this order and reiterated that "the arbitration clause in the purchase agreement at issue . . . is binding *as to the Plaintiffs* and D.R. Horton and, therefore, *Plaintiffs* and D.R. Horton are subject to arbitration." (Order on Mot. Reconsider, *Tyler*, slip op. at 2 (emphasis

added).)  As a result, the court stayed all proceedings related to the "*claims* between *Plaintiffs* and D.R. Horton."  (*Id.* at 3 (emphasis added).)  The court made no carve-out for a particular plaintiff or specific causes of action.

These rulings are consistent with those of the Texas Supreme Court, which has explicitly held that a subsequent purchaser "was bound by the arbitration clause in [a] purchase-and-sale agreement under the doctrine of direct-benefits estoppel."  *Lennar Homes of Tex. Land & Constr., Ltd. v. Whitely*, 672 S.W.3d 367, 372 (Tex. 2023).  The court noted that although the implied warranty of workmanship arose by operation of law, it existed alongside and was incorporated into the written contract.  *Id.* at 377–78.  As implied warranties can be modified by express warranties, the scope of the warranty and its effects could therefore be determined only by reference to that written contract.  *See id.* at 378–79; *cf. Rainey v. Simon*, 139 S.C. 337, 341, 138 S.E. 41, 41–42 (1927) (noting that "an express warranty precludes an implied warranty and limits the warranty to that expressed" (citation omitted)).  "In other words," the court stated, "although liability arises in part from the general law, *nonliability* arises from the terms of the express warrant[y] . . . ."  *Lennar Homes*, 672 S.W.3d at 379 (emphasis in original).  Therefore, the plaintiff's implied warranty claim "d[id] not stand independently of the [purchase-and-sale agreement]," *id.* at 379 (citation and internal quotation marks omitted), and the plaintiff was required to arbitrate her claims pursuant to that agreement, *id.* at 380.

In accord with *Dixon*, the *Tyler* orders, and the persuasive *Whitely* opinion, Plaintiffs' claims can be considered only in reference to the Homeowner Contracts and the rights and obligations contained therein.  Plaintiffs Williams and Smith's claims do not arise independently of those contracts, and they should be estopped from avoiding the arbitration provision to the same extent as Plaintiffs Wyatt and Iwinski.

## VI.     Class Arbitration Is Not Available

Finally, D.R. Horton addresses Plaintiffs' inevitable attempt to pursue class proceedings. Plaintiffs filed this case as a putative class action. However, the law is clear that parties cannot be required to participate in class arbitration unless their contract provides for it. The Supreme Court has ruled that this requires an *express* agreement between the parties, and where an agreement is silent or ambiguous on the issue, class arbitration cannot be compelled. Under this standard, the arbitration provisions in the Homeowner Contracts and the ICAs do not permit class arbitration. Plaintiffs and D.R. Horton agreed to arbitrate disputes *between themselves*, as did D.R. Horton and Subcontractors. D.R. Horton did not agree to participate in class arbitration, and the Court should reject any attempt by Plaintiffs to suggest otherwise.

Plaintiffs may attempt to overcome the conspicuous absence of consent to class arbitration using rules of contract interpretation, the broad nature of the arbitration provision, or the lack of a specific exclusion for class actions. Courts have soundly rejected all of these arguments.

It is well established that a party cannot be compelled "to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). In *Stolt-Nielsen*, the Supreme Court noted the great "differences between bilateral and class-action arbitration" and stated that an agreement's "silence on the issue of class-action arbitration" does not "constitute[] consent to resolve . . . disputes in class proceedings." *Id.* at 687. Therefore, parties cannot be compelled to participate in class arbitration where their agreement is silent on the issue. *Id.*

The Court expanded on this ruling in *Lamps Plus, Inc. v. Varela*, and addressed what should happen "when an agreement is not silent, but rather 'ambiguous' about the availability of [class] arbitration." *Lamps Plus*, 587 U.S. 176, 179 (2019). The contract in *Lamps Plus*—an employment

agreement—included a provision "stating that arbitration shall be in lieu of *any and all* lawsuits or other civil legal proceedings relating to [the plaintiff's] employment." *Id.* at 180 (emphasis added) (citation and internal quotation marks omitted). Interpreting the agreement under California law, the Ninth Circuit concluded that it "was ambiguous on the availability of class arbitration." *Id.* at 182. Then, the circuit court utilized "California's rule that ambiguity in a contract should be construed against the drafter" to conclude that the agreement allowed class arbitration. *Id.* at 186.

The Supreme Court reversed, noting the significant differences between individual and class arbitrations, *id.* at 184–85, and holding that "[c]ourts may not infer from an ambiguous agreement that parties have consented to arbitrate on a classwide basis," *id.* at 189. Moreover, the Court reaffirmed that it is improper to rely on rules of interpretation, such as resolving ambiguities in a contract against the drafter, to evade the law's requirement that parties must affirmatively agree to participate in class arbitration. *Id.* Courts cannot *infer* an agreement to participate in class arbitration from a broad and ambiguous arbitration clause. *See id.*; *see also Grant v. Jud Kuhn Chevrolet*, 431 S.C. 279, 285, 847 S.E.2d 806, 809 (Ct. App. 2020) (concluding that an agreement to arbitrate "any dispute, controversy or claim," combined with a reference to American Arbitration Association rules, did not amount to "consent to class arbitration").

Nor can Plaintiffs rely on the lack of a clause specifically *excluding* class actions from the list of arbitrable claims. Even if "the [parties'] agreement does not expressly exclude the possibility of classwide arbitration," what matters is that "the agreement does not include [class arbitration] either," which it must before the parties can be forced to engage in it. *Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594, 600 (6th Cir. 2013).

Here, the Homeowner Contracts contain *no mention* of class actions, in the arbitration provision or anywhere else. (*See, e.g.*, Wyatt Contract § 15.) Therefore, D.R. Horton is not subject to class arbitration, and the Court should compel individual arbitration between Plaintiffs, Defendant, and Subcontractors.

## CONCLUSION

D.R. Horton hereby ask this Court to compel the parties in this matter to submit to binding arbitration. The Homeowner Contracts and the ICAs represent arms' length transactions, and Plaintiffs and Subcontractors freely chose to enter those agreements. Moreover, the arbitration provision in the Homeowner Contracts should be evaluated on a standalone basis, separate from the warranty and disclaimer provisions, because it is contained within its own paragraph. When properly evaluated, there is no basis not to enforce the arbitration provisions in the parties' contracts: they are valid under the FAA; there are no general contract defenses that would invalidate them; and they require bilateral arbitration of matters like those at issue in this case.

Accordingly, this matter should be submitted to arbitration between Plaintiffs, D.R. Horton, and Subcontractors.

KENISON, DUDLEY & CRAWFORD, LLC

s/Kimila L. Wooten
John T. Crawford, Jr. (Fed. Bar # 9066)
Kimila L. Wooten (Fed. Bar # 5525)
David L. Paavola (Fed. Bar #11713)
Amelia M. Farmer (Fed. Bar #13891)

Jonathan Abrams (Fed. Bar #14158)
W. Jacob Henerey (Fed. Bar # 12724)
KENISON, DUDLEY & CRAWFORD, LLC
325 W McBee Ave, Suite 301
Greenville, SC 29601
Telephone: (864) 242-4899
Facsimile: (864) 242-4844
crawford@conlaw.com
wooten@conlaw.com
paavola@conlaw.com
farmer@conlaw.com
abrams@conlaw.com
henerey@conlaw.com
*Counsel for D.R. Horton, Inc.*

Greenville, SC
February 2, 2026