DocuSign Envelope ID: 451F7647-5172-4304-8F03-53DEE56EBBC1

EXHIBIT A

THESE DOCUMENTS HAVE BEEN AMENDED AND RESTATED.

DocuSign Envelope ID: 451F7647-5172-4304-8F03-53DEE56EBBC1

# SOUTH CAROLINA DISCLOSURE OF REAL ESTATE BROKERAGE RELATIONSHIPS



**South Carolina Real Estate Commission**
PO BOX 11847, Columbia, S.C. 29211-1847
Telephone: (803) 896-4400 Fax: (803) 896-4427
http://llr.sc.gov/POL/REC/

Pursuant to South Carolina Real Estate License Law in S.C. Code of Laws Section 40-57-370, a real estate licensee is required to provide you a meaningful explanation of agency relationships offered by the licensee's brokerage firm. This must be done at the first practical opportunity when you and the licensee have substantive contact.

Before you begin to work with a real estate licensee, it is important for you to know the difference between a broker-in-charge and associated licensees. The broker-in-charge is the person in charge of a real estate brokerage firm. Associated licensees may work only through a broker-in-charge. **In other words, when you choose to work with any real estate licensee, your business relationship is legally with the brokerage firm and not with the associated licensee.**

A real estate brokerage firm and its associated licensees can provide buyers and sellers valuable real estate services, whether in the form of basic **customer** services, or through **client**-level agency representation. The services you can expect will depend upon the legal relationship you establish with the brokerage firm. It is important for you to discuss the following information with the real estate licensee and agree on whether in your business relationship you will be a **customer** or a **client**.

## You Are a Customer of the Brokerage Firm

South Carolina license law defines customers as buyers or sellers who choose <u>NOT</u> to establish an agency relationship. The law requires real estate licensees to perform the following *basic duties* when dealing with *any* real estate buyer or seller as customers: *present all offers in a timely manner, account for money or other property received on your behalf, provide an explanation of the scope of services to be provided, be fair and honest and provide accurate information, provide limited confidentiality, and disclose "material adverse facts" about the property or the transaction which are within the licensee's knowledge.*

*Unless or until you enter into a written agreement with the brokerage firm for agency representation, you are considered a "customer" of the brokerage firm, and the brokerage firm will <u>not</u> act as your agent. As a customer, you should <u>not</u> expect the brokerage firm or its licensees to promote your best interest.*

Customer service does not require a written agreement; therefore, you are not committed to the brokerage firm in any way <u>unless a transaction broker agreement or compensation agreement obligates you otherwise</u>.

## Transaction Brokerage

A real estate brokerage firm may offer transaction brokerage in accordance with S.C. Code of Laws Section 40-57-350. Transaction broker means a real estate brokerage firm that provides customer service to a buyer, a seller, or both in a real estate transaction. A transaction broker may be a single agent of a party in a transaction giving the other party customer service. A transaction broker also may facilitate a transaction without representing either party. The duties of a brokerage firm offering transaction brokerage relationship to a customer can be found in S.C. Code of Laws Section 40-57-350(L)(2).

## You Can Become a Client of the Brokerage Firm

Clients receive more services than customers. If client status is offered by the real estate brokerage firm, you can become a client by entering into a written agency agreement requiring the brokerage firm and its associated licensees to act as an agent on your behalf and promote your best interests. If you choose to become a client, you will be asked to confirm in your written representation agreement that you received this agency relationships disclosure document in a timely manner.

A *seller becomes a client* of a real estate brokerage firm by signing a formal listing agreement with the brokerage firm. For a seller to become a client, this agreement must be in writing and must clearly establish the terms of the agreement and the obligations of both the seller and the brokerage firm which becomes the agent for the seller.

A *buyer becomes a client* of a real estate brokerage firm by signing a formal buyer agency agreement with the brokerage firm. For a buyer to become a client, this agreement must be in writing and must clearly establish the terms of the agreement and the obligations of both the buyer and the brokerage firm which becomes the agent for the buyer.

(Rev 1/17) Page **1** of **2**

# SOUTH CAROLINA DISCLOSURE OF REAL ESTATE BROKERAGE RELATIONSHIPS



**South Carolina Real Estate Commission**
PO BOX 11847, Columbia, S.C. 29211-1847
Telephone: (803) 896-4400 Fax: (803) 896-4427
http://llr.sc.gov/POL/REC/

If you enter into a written agency agreement, as a client, the real estate brokerage has the following *client-level duties: obedience, loyalty, disclosure, confidentiality, accounting, and reasonable skill and care*. Client-level services also include advice, counsel and assistance in negotiations.

## Single Agency

When the brokerage firm represents only one client in the same transaction (the seller or the buyer), it is called single agency.

## Dual Agency

Dual agency exists when the real estate brokerage firm has two clients in one transaction – a seller client and a buyer client. At the time you sign an agency agreement, you may be asked to acknowledge whether you would consider giving written consent allowing the brokerage firm to represent both you and the other client in a disclosed dual agency relationship.

## Disclosed Dual Agency

In a disclosed dual agency, the brokerage firm's representation duties are limited because the buyer and seller have recognized conflicts of interest. Both clients' interests are represented by the brokerage firm. As a disclosed dual agent, the brokerage firm and its associated licensees cannot advocate on behalf of one client over the other, and cannot disclose confidential client information concerning the price negotiations, terms, or factors motivating the buyer/client to buy or the seller/client to sell. Each Dual Agency Agreement contains the names of both the seller client(s) and the buyer client(s) and identifies the property.

## Designated Agency

In designated agency, a broker-in-charge may designate individual associated licensees to act solely on behalf of each client. Designated agents are not limited by the brokerage firm's agency relationship with the other client, but instead have a duty to promote the best interest of their clients, including negotiating a price. The broker-in-charge remains a disclosed dual agent for both clients, and ensures the assigned agents fulfill their duties to their respective clients. At the time you sign an agency agreement, you may be asked to acknowledge whether you would consider giving written consent allowing the brokerage firm to designate a representative for you and one for the other client in a designated agency. Each Designated Agency Agreement contains the names of both the seller client(s) and the buyer client(s) and identifies the property.

## It's Your Choice

As a real estate consumer in South Carolina, it is your choice as to the type and nature of services you receive.

- You can choose to remain a customer and represent yourself, with or without a transaction broker agreement.
- You can choose to hire the brokerage firm for representation through a written agency agreement.
- If represented by the brokerage firm, you can decide whether to go forward under the shared services of dual agency or designated agency or to remain in single agency.

If you plan to become a client of a brokerage firm, the licensee will explain the agreement to you fully and answer questions you may have about the agreement. Remember, however that until you enter into a representation agreement with the brokerage firm, you are considered a customer and the brokerage firm cannot be your advocate, cannot advise you on price or terms, and only provides limited confidentiality <u>unless a transaction broker agreement obligates the brokerage firm otherwise</u>.

The choice of services belongs to you – the South Carolina real estate consumer.

**Acknowledgement of Receipt by Consumer:**

DocuSigned by:

*William D Wyatt*
068552426B1B402...
_____    __5/7/2020___
**Buyer:** William D Wyatt                                      Date

**THIS DOCUMENT IS NOT A CONTRACT.**
**This brochure has been approved by South Carolina Real Estate Commission for use in explaining representation issues in real estate transactions and consumer rights as a buyer or seller. Reprinting without permission is permitted provided no changes or modifications are made.**

(Rev 1/17) Page **2** of **2**

DocuSign Envelope ID: 451F7647-5172-4304-8F03-53DEE56FBBC1

# SOUTH CAROLINA DISCLOSURE OF REAL ESTATE BROKERAGE RELATIONSHIPS

**South Carolina Real Estate Commission**
PO BOX 11847, Columbia, S.C. 29211-1847
Telephone: (803) 896-4400 Fax: (803) 896-4427
http://llr.sc.gov/POL/REC/

DocuSigned by:

*Jeanne M. Wyatt*

B3E22D99794D482...

_____    _5/7/2020____

**Co-Buyer:** Jeanne M. Wyatt                    Date

(Rev 1/17) Page **3** of **2**

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1

## HOME PURCHASE AGREEMENT

**NOTE:   THIS CONTRACT PROVIDES FOR MANDATORY BINDING ARBITRATION PURSUANT TO THE SOUTH CAROLINA UNIFORM ARBITRATION ACT, SECTIONS 14-48-10 ET SEQ., SOUTH CAROLINA CODE OF LAWS (1976, AS AMENDED).**

In consideration of the reciprocal covenants stated herein, **D.R. Horton, Inc., a Delaware Corporation**, ("Seller") and **William D Wyatt and Jeanne M. Wyatt** (collectively, "Purchaser") agree as follows:

**1.   CONVEYANCE.**   Seller shall sell to Purchaser and Purchaser shall purchase from Seller all that certain parcel or tract of land located in **ANDERSON** County, **SC**, with a street address of **126 RIVERMILL PLACE, PIEDMONT, SC   29673**, more particularly described as Lot **0019**, Block , **River Mill** Subdivision (the "Lot"), together with all improvements thereon and all appurtenances thereto collectively referred to as the "Property."

**2.   PURCHASE PRICE AND METHOD OF PAYMENT.**   Subject to adjustment as may be provided herein, the Purchase Price for the Property shall be: **Three Hundred Twelve Thousand and 00/100 Dollars ($312,000.00)** to be paid in cash as provided herein. The following is a breakdown of the Purchase Price as of the Effective Date (defined in Section 19 below):

| | |
|---|---|
| Base Price | $269,990.00 |
| Plus Lot Premium | + $     0.00 |
| Plus Options Selected To Date | + $54,617.00 |
| Minus Option Incentive | $     0.00 |
| Minus Special Discount | <$12,607.00> |
| Total Purchase Price | $312,000.00 |

Purchaser acknowledges that the Special Discount shown above shall be provided to Purchaser as a credit against the Purchase Price only if Purchaser complies all of the terms and conditions of this Agreement and that such Special Discount shall be forfeited by Purchaser if Purchaser breaches the Agreement in any respect.   Purchaser further acknowledges that the above-stated Incentives are subject to the terms and conditions (including, without limitation, closing deadlines) set forth in Seller's marketing materials pertaining to such Incentives.

The terms of the subsection (a or b) checked below shall also apply.

○ **a.   No Financing Contingency.**

Purchaser shall pay to Seller the Purchase Price in cash at Closing (See Section 16 below). Within seven (7) business days of the Effective Date, Purchaser shall provide documentation to Seller that will verify to Seller's reasonable satisfaction that Purchaser has the available funds necessary to purchase the Property according to the terms of this Agreement. If Purchaser does not provide such documentation to Seller within that time period, then Seller may at its option terminate this Agreement by providing written notice to Purchaser of termination, in which event Seller shall retain the Earnest Money (see Section 4 below) and neither party shall have any further obligation or liability to the other hereunder.

⊗ **b.   Financing Contingency**

(1) Purchaser shall use its best efforts to obtain a loan in the principal amount of no more than **95%** of the Purchase Price, reduced to the next lowest hundred dollars, (the "Loan") to be secured by a first priority mortgage on the Property. The proceeds of the Loan, together with the balance of the Purchase Price, shall be paid to Seller by Purchaser in cash or other immediately available funds at Closing.

(2)   Purchaser shall apply for the Loan within three (3) business days after the Effective Date. **Failure by Purchaser to apply for the Loan within that time-period or to pursue approval of the Loan diligently thereafter shall constitute a material breach of this Agreement by Purchaser.** Within seven (7) days after the Effective Date, Purchaser shall provide Seller with a letter from Purchaser's lender confirming that Purchaser has pre-qualified for the Loan (the "Pre-qualification Letter"). Within twenty-one (21) days of the Effective Date, Purchaser shall provide Seller with a letter from Purchaser's lender confirming that the Loan has been conditionally approved (the "Conditional Approval Letter"). Within thirty (30) days of the Effective Date, Purchaser shall provide Seller with a letter from Purchaser's lender confirming that the Loan has been fully and finally approved, with no conditions or contingencies (the "Final Approval Letter"). If Purchaser fails to provide the Pre-qualification Letter, the Conditional Approval Letter or the Final Approval Letter to Seller within the applicable required time-period, then Seller, at Seller's option, may terminate this Agreement upon written notice to Purchaser, in which event the Earnest Money shall be refunded to Purchaser if Purchaser is not in breach of this Agreement, and thereafter neither party shall have any further liability or obligation to the other hereunder.

(3)   Purchaser acknowledges that there are many different loan programs available from many different lenders. Purchaser understands and acknowledges that certain loan/credit approvals are only valid for up to one hundred twenty (120) days. Purchaser shall update loan/credit approval documentation as needed in order to maintain current loan approval up until the date of closing. Purchaser agrees to execute all papers and perform all other actions necessary to obtain the Loan and to accept the Loan if approved by lender.

Page 1 of 8          Home Purchase Agreement (Greenville) (rev. 9.24.19)

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1    126 RIVERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce    **Job:** 708760019

8:26-cv-00097-DCC    Date Filed 02/02/26    Entry Number 24-2    Page 6 of 35

Purchaser shall, in addition to the payment of principal and interest upon the Loan, pay at Closing such amounts as may be required by the lender to establish or maintain an escrow for insurance, property taxes or private mortgage insurance.

(4)    **FOR FHA/VA LOANS ONLY:**

(i)    **FHA Amendatory Clause.**   If Purchaser applies for and obtains a commitment for an FHA-insured loan, then, notwithstanding any other provisions of this Agreement, Purchaser shall not be obligated to complete the purchase of the Property or to incur any penalty, by forfeiture of earnest money or any other deposit, or otherwise, unless Purchaser has been given, in accordance with HUD/FHA requirements, a written statement by the Federal Housing Commissioner or a Direct Endorsement lender setting forth the appraised value of the Property of not less than $312,000.00. Purchaser shall have the privilege and option of proceeding with consummation of the Agreement without regard to the amount of the appraised valuation.  The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure.   HUD does not warrant the value or condition of the Property.   Purchaser should satisfy himself/herself that the price and condition of the Property are acceptable.

(ii)    **Escape Clause for VA Loans:**   It is expressly agreed that, if Purchaser applies for and obtains a commitment for a VA-guaranteed mortgage loan, then, notwithstanding any other provisions of the Agreement, Purchaser shall not incur any penalty, by forfeiture of earnest money or any other deposit, or otherwise, nor shall Purchaser be obligated to complete the purchase of the Property if the Purchase Price or cost exceeds the reasonable value of the Property established by the Department of Veterans Affairs.  Purchaser shall, however, have the privilege and option of proceeding with the consummation of the Agreement without regard to the amount of the reasonable value established by the Department of Veterans Affairs (Authority: 38 U.S.C. 501, 3703(c)(1)).

(iii)    **Additional Funding:**   Purchaser agrees that, should Purchaser elect to complete the purchase of the Property at an amount in excess of the appraised value, Purchaser shall pay such excess amount in cash from a source Purchaser agrees to disclose to the FHA or VA (as applicable) and that Purchaser represents will not be from borrowed funds, except as approved by the FHA or VA (as applicable).

**3. FINANCIAL INFORMATION.**   Purchaser acknowledges that Purchaser's financial situation may affect Purchaser's ability to obtain a loan and/or purchase this Property. Purchaser further acknowledges that it is important for the Seller to know Purchaser's financial situation and Purchaser's ability to obtain financing. Purchaser hereby grants permission for the Seller to contact any mortgage company or financial institution to which Purchaser may apply for a loan and to discuss Purchaser's financial situation and prospects of obtaining a loan. Purchaser hereby authorizes any mortgage company or financial institution from which Purchaser may seek a loan to discuss Purchaser's financial status with the Seller and to provide the Seller with any documentation or information regarding said financial status, including but not limited to Purchaser's credit score.  **Purchaser hereby authorizes and directs the settlement agent conducting the Closing to disclose to Seller the type of mortgage loan obtained by Purchaser (e.g., FHA, VA, USDA, Conventional) to purchase the Property**.

**4. DEPOSITS.**

a.    **Earnest Money**.   The parties hereby acknowledge that, as of the Effective Date, Purchaser has deposited with Seller earnest money in the amount shown below (the "Initial Deposit"). Purchaser shall pay to Seller Additional Deposits of earnest money in the amounts shown below by the due dates shown below. The Initial Deposit and any additional deposits of earnest money paid by Purchaser to Seller are hereinafter referred to as the "Earnest Money," both individually and collectively. Failure by Purchaser to pay any Additional Deposit(s) by the applicable due date shall constitute a material breach of this Agreement by Purchaser. The schedule of Earnest Money deposits is as follows:

| Earnest Deposits | | | | | |
| --- | --- | --- | --- | --- | --- |
| Due Date | Collection Date | Payment Type | Check Number | Deposit Amount | Collection Amount |
| 05/07/2020 | | | | $2,500.00 | $    0.00 |
| | | | **Total** | **$2,500.00** | **$    0.00** |

The Earnest Money shall be deposited with Seller in its general account upon execution of this Agreement by Seller. Purchaser acknowledges that the Earnest Money will be commingled with other funds of Seller and may be used by Seller for any purpose.

b.    **Disbursement**.   The Earnest Money shall be retained by Seller except as otherwise expressly stated in this Agreement. At Closing, the Earnest Money shall be credited to Purchaser against the Purchase Price; otherwise, the Earnest Money shall be disbursed as provided herein. If any dispute arises between Purchaser and Seller as to the final disposition of all or part of the Earnest Money, Seller may, but shall not be required to, interplead all or any disputed part of the Earnest Money into a court of competent jurisdiction. If Seller interpleads the Earnest Money into a court, Seller shall be entitled to recover the costs of such interpleader, including reasonable attorney's fees incurred in connection with the interpleader, from the Earnest Money.

c.    **Deposits of VA Borrowers**.

i.    Purchaser Notice Regarding Mortgage Loan.   Purchaser hereby represents that it [*SELECT ONE*] ○ DOES / ⊗ DOES NOT intend to apply for and obtain a mortgage loan guaranteed by the U.S. Department of Veterans Affairs (a "*VA Loan*") to purchase the Property. **IF PURCHASER DOES NOT CURRENTLY INTEND TO OBTAIN A VA LOAN, BUT LATER DECIDES TO OBTAIN A VA LOAN, PURCHASER SHALL PROMPTLY NOTIFY SELLER IN WRITING.**

ii.    Trust Account; Disbursement.   Notwithstanding any other provision of this Agreement, if Purchaser obtains a

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1    126 RIVERMILL PLACE, **Sales Rep:**  Mary Jeanette Pearce    **Job: 708760019**

8:26-cv-00097-DCC     Date Filed 02/02/26     Entry Number 24-2     Page 7 of 35

VA Loan, then the Earnest Money, Option Money (hereinafter defined), and all other sums deposited by Purchaser pursuant to this Agreement (collectively, the "*Deposits*") shall be deposited in a trust account that is safeguarded from the claims of creditors of Seller until the Deposits are (A) disbursed at Closing or (B) otherwise applied or disbursed in accordance with the terms of this Agreement.

**5. SURVEY.**  At Closing, Seller shall provide Purchaser with a plat of survey of the Lot performed by an independent, licensed surveyor, showing all structures and other improvements located on the Property as of the date of the survey (the "Survey").   At Closing, Purchaser shall pay Seller a reasonable fee of Four Hundred Dollars ($400.00) for obtaining and providing the Survey (the "Survey Fee"). Seller makes no warranty or representation whatsoever regarding the quality, accuracy or reliability of the Survey. Seller makes no warranty or representation whatsoever regarding the quality, accuracy or reliability of any survey of the Property obtained for the benefit Purchaser pursuant to this subsection, and Purchaser shall look solely to the surveyor for same. Purchaser acknowledges that any title insurance policy issued in favor of Purchaser may contain an exception from coverage for all matters that would be revealed by a current survey of the Property.

**6. WARRANTY OF TITLE.**  Seller shall convey insurable fee simple title in and to the Property to Purchaser at Closing by special or limited warranty deed (the "Deed"), subject to: (a) zoning ordinances affecting the Property; (b) utility, drainage and other easements, deed restrictions or other conditions or restrictions of record upon which do not prevent use or enjoyment of the Lot or the House constructed thereon; (c) subdivision covenants, conditions and restrictions; (d) all matters shown on the final plat for the subdivision where the Property is located; (e) all prior conveyances of all rights, titles and interests to all oil, gas, water, petroleum, natural gas, coal, lignite and other minerals and hydrocarbons, and all geothermal energy and resources, located in whole or in part on, in or under the Lot and/or that may be produced or extracted from the Lot; and (f) any matters that would be shown or revealed by a current survey of the Lot. As used in this Agreement, "insurable fee simple title" shall mean title which a title insurance company licensed to do business in South Carolina will insure at its regular rates, subject only to its standard exceptions and those exceptions listed in subsections (a) through (e) above.

**7. TITLE EXAMINATION.**  Purchaser shall have until ten (10) days prior to the Closing Date (as defined in Section 16 below) to examine title to the Property and to furnish Seller with a written statement of any exceptions to insurable title. If Purchaser does not serve Seller with notice of exception to insurable title prior to that date, Purchaser shall have waived any objection to title to the Property as it existed as of the Effective Date. If Purchaser does serve such notice on Seller prior to that date, the notice shall specify and itemize the exceptions to insurable title. If Seller does not remove any exceptions to insurable title within a reasonable time, Purchaser shall have the right to terminate this Agreement and to receive a refund of the Earnest Money and Option Money (as defined in Exhibit B attached hereto), if any, paid to Seller. Under no circumstances shall Seller be obligated or required to remove or cure any exception to title to the Property that is a permissible exception to insurable title as defined in Section 6 above.

**8. DESTRUCTION.**  If the home built on the Lot (the "House") is either totally destroyed or substantially damaged (as determined by Seller in its sole discretion) before Closing, either party may terminate this Agreement by written notice to the other within ten (10) days after the date of such destruction. From and after the Closing (see Section 16 below), all risk of loss to the Property shall be upon Purchaser.

**9. INSPECTION.**

     **a.  Procedure**.  Prior to Closing, Seller shall have the right to deny access to the Lot to any person at any time, as Seller determines in its sole discretion. However, Purchaser or a professional home inspector contracted by Purchaser shall have the right to enter upon the Property at reasonable times during normal business hours for the purpose of inspecting, examining, testing and surveying the Property, solely at Purchaser's expense, provided that any such inspection must meet the following requirements and conditions (collectively, "Inspections"):

     (1)  Inspections by Purchaser:

     (a)  All Inspections by Purchaser must be scheduled through the Community Construction Superintendent. These Inspections must be scheduled at least seven (7) days in advance, must take place during normal working hours (Mon. – Fri. 8:00AM to 4:00PM) and must be in accordance with Seller's production schedule.

     (b)  Seller or its appointed representative shall have the right to accompany Purchaser during the Inspections.

     (2)  Inspections by an independent professional home inspector:

     (a)  All Inspections by a professional home inspector must be scheduled through the Community Construction Superintendent at least seven (7) days in advance and must take place during normal working hours (Mon. – Fri. 8:00AM to 4:00PM). All requests for appointments to conduct an Inspection shall be subject to the Community Construction Superintendent's production schedule. NO INSPECTIONS WILL BE ALLOWED THAT HAVE NOT BEEN SCHEDULED WITH THE COMMUNITY CONSTRUCTION SUPERINTENDENT AT LEAST SEVEN (7) DAYS IN ADVANCE. SELLER WILL NOT DELAY CONSTRUCTION OR CLOSING TO ACCOMMODATE INSPECTIONS.

     (b)  Seller or its appointed representative shall have the right to accompany the home inspector during the Inspection.

     (c)  The home inspector must maintain all business licenses required by state and local law and must be: (i) either a licensed professional engineer, or (ii) a full-time home inspector and a member of the American Society of Home Inspectors, Inc. Furthermore, if the home inspector intends to use a drone at any time on or around the Property, the home inspector must be licensed by the Federal Aviation Administration to operate the drone.   The home inspector must provide the Community Construction Superintendent with proof of all licenses and certifications required by this subsection (c) prior to, and as a requirement for, making an appointment for the Inspection.

     (d)  The home inspector must furnish Seller with proof that the home inspector has: (i) worker's compensation insurance in accordance with applicable law; (ii) errors and omissions insurance with coverage of no less than $300,000 per occurrence; (iii) general liability insurance with coverage of no less than $300,000.00 per occurrence; and (iv) if the home inspector intends to use

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1    126 RIVERMILL PLACE, **Sales Rep:**  Mary Jeanette Pearce                **Job:** **708760019**

8:26-cv-00097-DCC    Date Filed 02/02/26    Entry Number 24-2    Page 8 of 35

a drone at any time on or around the Property, aviation liability insurance with coverage of no less than $1,000,000.00 per occurrence. The home inspector must provide the Community Construction Superintendent with proof of all insurance coverages required by this subsection (d) prior to, and as a requirement for, making an appointment for the Inspection.

**Failure by Purchaser to follow the procedures set forth in this subsection shall constitute a material breach of this Agreement. Unauthorized entry onto the Lot or unauthorized activities upon the Lot by Purchaser, its agents or contractors shall constitute a material breach of this Agreement by Purchaser. Purchaser specifically acknowledges that Purchaser may not, under any circumstances, install or construct any equipment, fixtures, structures or other improvements upon the Lot, or modify any of the existing equipment, fixtures, structures or other improvements, at any time and any such unauthorized activities shall constitute a material breach of the Agreement by Purchaser. Purchaser shall not interrupt or otherwise interfere with sales or construction within the Subdivision. Upon completion of any Inspection, Purchaser shall restore the Property to its condition prior to the Inspection.**

**THE CLOSING SHALL NOT BE DELAYED DUE TO PURCHASER'S FAILURE TO SCHEDULE AND CONDUCT ALL INSPECTIONS SUFFICIENTLY IN ADVANCE OF CLOSING TO ALLOW SELLER TO ADDRESS ISSUES, IF ANY, IDENTIFIED BY THE INSPECTIONS.**

      **b**. **Purchaser's Indemnity**.   Purchaser assumes all responsibility for the acts of Purchaser, Purchaser's agents, contractors or representatives in exercising Purchaser's rights under this Section, and shall indemnify and hold Seller harmless, to the extent permitted by applicable law, from any loss or expense Seller may suffer as a result of any claim or damage which arises directly or indirectly out of Purchaser's exercise of its rights under this Section. Notwithstanding any other provision herein, Purchaser's indemnity of Seller pursuant to this Section shall survive Closing and the termination of this Agreement for any reason.

      **c**. **Inspection Results**.   In the event any inspection by Purchaser or its agents or contractors reveals a purported defect in the Property, Purchaser shall provide Seller with written notice of the claim of defect. If a professional home inspection was performed, the home inspector must prepare a report (including references to any applicable code sections). Purchaser shall deliver to Seller a true and complete copy of any report produced by the home inspector within forty-eight (48) hours of receipt of such report by Purchaser. If Seller determines the claim of defect is valid, Seller shall correct or repair the defect. If Seller determines the claim of defect is not valid, Seller shall notify the Purchaser of that determination within thirty (30) days of receipt of the written notice of claim of defect. Notwithstanding any other provision herein, Seller shall not be required to correct or repair any defect in construction that does not constitute a violation of: (1) the building code of the governing jurisdiction in which the Property is located, or (2) the building guidelines and standards of the provider of the Limited Warranty pursuant to Section 14(a) below.

      **d**. **Walkthrough; Punch List**:   Prior to Closing, Seller and Purchaser will meet at the Property to conduct a walkthrough inspection and orientation, in accordance with Seller's standard practices (the "Initial Walkthrough"). At the conclusion of the Initial Walkthrough, Purchaser and Seller shall prepare and sign a written list of items on the Property that the parties agree should be corrected, repaired or replaced (hereinafter, the "Punch List"). Seller shall thereafter correct, repair or replace the items listed on the Punch List. Under no circumstances shall Seller be required to correct, repair or replace any items on or of the Property that are not listed on the Punch List signed by Seller. Within a reasonable amount of time after the Initial Walkthrough but prior to Closing, Seller and Purchaser shall meet at the Property to conduct a second walkthrough inspection (the "Final Walkthrough") in order to confirm which items on the Punch List have been corrected, repaired or replaced. At the conclusion of the Final Walkthrough, the parties will prepare and sign an updated Punch List reflecting the current status of each item thereon. Seller's obligation to correct, repair or replace any items that are listed on the Punch List shall survive Closing. Both the Initial Walkthrough and the Final Walkthrough shall take place at the hours of 10am, noon, or 2pm.   UNDER NO CIRCUMSTANCES SHALL CLOSING BE DELAYED DUE TO SELLER'S FAILURE TO COMMENCE OR COMPLETE CORRECTION, REPAIR OR REPLACEMENT OF ANY ITEMS ON A PUNCH LIST. UNDER NO CIRCUMSTANCES SHALL FUNDS BE ESCROWED AT CLOSING TO COVER THE COST OF CORRECTION, REPAIR OR REPLACEMENT OF ANY ITEMS ON A PUNCH LIST.

**10. REAL ESTATE BROKER AND COMMISSION.  SELLER IS LICENSED AS A REAL ESTATE OFFICE IN SOUTH CAROLINA.** In negotiating this Agreement, Seller has acted as its own real estate broker.   Purchaser acknowledges that Seller's sales agents represent Seller only and do not represent Purchaser or have any duty to Purchaser. Purchaser represents to Seller that Purchaser has not employed any real estate broker, agent or finder in connection with this Agreement, other than , an agent of   and   (collectively, "Co-Broker"). Purchaser shall indemnify and hold Seller harmless from and against any and all liabilities, losses, costs, damages and expenses (including attorneys' fees and expenses and costs of litigation) that Seller may suffer or incur because of any claim by any broker, agent or finder, whether or not meritorious, for any compensation with regard to this transaction arising out of any acts or contracts of Purchaser, other than the Co-Broker named above. Notwithstanding any other provision herein, the provisions of this Section shall survive Closing or termination of this Agreement for any reason. Purchaser acknowledges receipt of a copy of the disclosure titled Agency Relationships in Real Estate Disclosure

**11.   NO RELIANCE.**   Purchaser acknowledges that it has not relied upon the advice or representations, if any, of Seller or Seller's salespersons or other agents with regard to the legal and tax consequences of this Agreement or the terms and conditions of any proposed financing of the purchase of the Property. Purchaser acknowledges that if such matters are of concern to Purchaser, Purchaser must obtain independent, professional advice regarding them.

**12. WOOD INFESTATION REPORT.**    At the time of Closing, Seller shall provide Purchaser with a letter or a soil treatment report from a pest-control company licensed in South Carolina certifying that the Lot has been treated within one (1) year of the date of Closing for subterranean termite infestation. If required by Purchaser's lender, Purchaser may obtain at Seller's expense a South Carolina Wood Infestation Report performed by a pest-inspection company licensed in South Carolina.

**13. HAZARDOUS SUBSTANCES.**   Purchaser acknowledges that Seller makes no representation or warranty with respect to the presence or absence of toxic waste, radon, hazardous materials or other undesirable substances on the Property. SELLER HEREBY DISCLAIMS ANY LIABILITY OR RESPONSIBILITY FOR THE PRESENCE OF ANY SUCH SUBSTANCES IN, ON, UNDER OR ABOUT THE PROPERTY.

**14. WARRANTIES AND DISCLAIMER.**

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1   126 RIVERMILL PLACE, **Sales Rep:**   Mary Jeanette Pearce      Job: **708760019**

8:26-cv-00097-DCC      Date Filed 02/02/26      Entry Number 24-2      Page 9 of 35

a. **Ten-Year Limited Warranty**.  Seller shall provide Buyer with a written, ten-year limited warranty on the House administered by Residential Warranty Corporation ("RWC") which shall be effective as of the Closing Date. The terms and conditions of, and exclusions from, the ten-year limited warranty shall be as set forth in that document published by RWC entitled, "LIMITED WARRANTY, 10 YEAR LIMITED WARRANTY FOR NEW HOMES," and referred to herein as the "Limited Warranty." At Closing, Seller shall deliver to Buyer the actual Limited Warranty for the House, to be validated by RWC after Closing.

b. **Manufacturers' Warranties**.  At Closing, Seller shall assign to Purchaser all warranties, expressed or implied, which are given by the manufacturer of any appliance or product installed in the House.

c. **Disclaimer and Limitation on Seller's Liability**.  THE LIMITED WARRANTY GIVEN TO PURCHASER BY SELLER PURSUANT TO SUBSECTION 14a ABOVE IS TO THE EXCLUSION OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, AND SELLER HEREBY DISCLAIMS ANY AND ALL SUCH OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF HABITABILITY, MERCHANTABIITY OR FITNESS FOR A PARTICULAR PURPOSE. IN ADDITION, SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER REGARDING THE PAST, PRESENT OR FUTURE CONDITION OR USE OF ANY LANDS OR AREAS SURROUNDING THE PROPERTY OR IN THE VICINITY OF THE PROPERTY. AFTER CLOSING, SELLER SHALL HAVE NO LIABILITY OR OBLIGATION TO PURCHASER OF ANY NATURE WHATSOEVER EXCEPT AS PROVIDED IN THIS SECTION 14 OF THIS AGREEMENT, IN SECTION 9(d) ABOVE AND IN SELLER'S DEED TO PURCHASER. EXCEPT AS OTHERWISE PROVIDED IN THE LIMITED WARRANTY, SELLER SHALL NOT BE LIABLE FOR ANY REASON, UNDER ANY CIRCUMSTANCES, TO PURCHASER OR ANYONE CLAIMING THROUGH PURCHASER FOR MONETARY DAMAGES OF ANY KIND, INCLUDING SECONDARY, CONSEQUENTIAL, PUNITIVE, GENERAL, SPECIAL, OR INDIRECT DAMAGES.

**Initials**
Buyer    Co-Buyer    Seller

15.   **MANDATORY BINDING ARBITRATION.**   PURCHASER AND SELLER SHALL SUBMIT TO BINDING ARBITRATION ANY AND ALL DISPUTES WHICH MAY ARISE BETWEEN THEM REGARDING THIS AGREEMENT AND/OR THE PROPERTY, INCLUDING BUT NOT LIMITED TO ANY DISPUTES REGARDING: (A) SELLER'S CONSTRUCTION AND DELIVERY OF THE HOME; (B) SELLER'S PERFORMANCE UNDER ANY PUNCH LIST OR INSPECTION AGREEMENT; AND (C) THE LIMITED WARRANTY PURSUANT TO SECTION 14 ABOVE. THE ARBITRATION SHALL TAKE PLACE IN THE COUNTY IN WHICH THE PROPERTY IS LOCATED. THE PROCEEDING SHALL BE CONDUCTED PURSUANT TO THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION, AND TO THE EXTENT POSSIBLE, UNDER RULES WHICH PROVIDE FOR AN EXPEDITED HEARING. THE FILING FEE FOR THE ARBITRATION SHALL BE PAID BY THE PARTY FILING THE ARBITRATION DEMAND, BUT THE ARBITRATOR SHALL HAVE THE RIGHT TO ASSESS OR ALLOCATE THE FILING FEES AND ANY OTHER COSTS OF THE ARBITRATION AS A PART OF THE ARBITRATOR'S FINAL ORDER. THE ARBITRATION SHALL BE BINDING AND FINAL, AND EITHER PARTY SHALL HAVE THE RIGHT TO SEEK JUDICIAL ENFORCEMENT OF THE ARBITRATION AWARD. NOTWITHSTANDING ANY OTHER PROVISION HEREIN, ANY DISPUTES ARISING UNDER THE LIMITED WARRANTY SHALL BE MEDIATED, ARBITRATED AND/OR JUDICIALLY RESOLVED PURSUANT TO THE TERMS, CONDITIONS, PROCEDURES AND RULES OF THAT WARRANTY PROGRAM. NOTWITHSTANDING THE FOREGOING, SELLER SHALL HAVE THE RIGHT TO INTERPLEAD ALL OR ANY PART OF THE EARNEST MONEY INTO A COURT OF COMPETENT JURISDICTION AS PROVIDED FOR IN SECTION 4 HEREIN. NOTWITHSTANDING THE FOREGOING, THE ARBITRATION PROVISIONS OF THIS SUBSECTION (B) SHALL NOT APPLY IN THE EVENT THAT THE DISPUTE RELATES TO A DEFAULT BY THE SELLER UNDER SECTION 16(F) OF THIS AGREEMENT.

**Initials**
Buyer    Co-Buyer    Seller

**16. CLOSING.**  The following shall constitute the "Closing": (a) receipt by the settlement agent of all funds necessary to close the transaction, (b) receipt by the settlement agent of the fully executed Deed for immediate recording in the office of the clerk of court or register of deeds, as applicable, (c) execution of the Closing Disclosure by Purchaser, Seller and the settlement agent, and (d) payment to Seller of the net proceeds of sale due to Seller. The date on which the Closing Disclosure is executed by all parties is referred to herein as the "Closing Date." Closing shall not be complete until Seller has received full payment of the Purchase Price. Keys to and possession of the Property will not be delivered to Purchaser until the Closing is complete. Closing shall be scheduled and conducted as follows:

a. **Closing Date.**   The parties estimate that the Closing will take place on or before **05/29/20**. Seller shall notify Purchaser of the final date and time of Closing at least three (3) business days in advance. Subject only to the provisions of Section 27 below, Closing shall occur no later than that date which is two (2) years after the date that Purchaser signs this Agreement.

b. **Exchange at Closing.**    At Closing, Seller shall deliver to Purchaser the Deed for the Property, a certificate of occupancy for the house located on the Property issued by the applicable governmental authority, and, if applicable, a certificate of final approval by the FHA or VA. At Closing, Purchaser shall pay to Seller the Purchase Price in full.

c. **Place of Closing.**    Closing shall take place at the office of a closing agent to be selected by Purchaser in **Greenville**, ⊗ South Carolina / ○ North Carolina, or at such other place as the parties may agree in advance.

d. **Closing Costs.**    Except as may be prohibited by FHA or VA regulations, Purchaser shall pay for all costs related to the Closing, including, but not limited to, the costs for preparation of the Deed, the cost of any title search, the cost for preparation and

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1    126 RIVERMILL PLACE, **Sales Rep:**  Mary Jeanette Pearce    **Job: 708760019**

8:26-cv-00097-DCC    Date Filed 02/02/26    Entry Number 24-2    Page 10 of 35

issuance of an owner's policy of title insurance and endorsements thereto, the Survey Fee, recording fees, deed and transfer taxes (deed stamps) imposed by the State of South Carolina upon the recording of the Deed, any capital contribution, initial assessment, transfer fee or estoppel certificate fee charged by the Association (as defined in Section 20), any costs and expenses associated with Purchaser's financing of Purchaser's acquisition of the Property, and any closing fee charged by the settlement agent.

**e. Prorations.** All real property taxes for the current year, homeowner association dues and assessments for the current assessment period (but not homeowner association capital assessments due at or after the Closing) and hazard insurances premiums (if applicable), shall be prorated as of the Closing Date, using the most accurate information available on the Closing Date.

**f. Completion of House**.   If the House is not Complete at the time that the Purchaser signs this Agreement, Seller shall Complete the House within 2 years after the date that the Purchaser signs this Agreement, subject to extensions for circumstances reasonably beyond Seller's control as determined by South Carolina law. For purposes of this subsection (f), "Complete" means that the House is ready for occupancy by Purchaser, has all necessary and customary utilities extended to it, and a certificate of occupancy has been issued. Notwithstanding any provision in this Agreement to the contrary, including but not limited to Section 18(b), nothing herein shall limit Purchaser's remedies if Seller defaults under this subsection (f).

**17.   UTILITIES AND PERSONAL PROPERTY**.     Purchaser shall transfer all utilities into Purchaser's name within three (3) business days after Closing. Purchaser shall not move any personal property onto the Property prior to Closing.

**18.   DEFAULT; REMEDIES.**     The remedies specified below shall be the sole and exclusive remedies available to the parties in the event of breach of this Agreement prior to Closing or termination of this Contract, and shall be to the exclusion of all other remedies at law or in equity.

**a.   Purchaser's Default.**   If Purchaser defaults on any of its obligations hereunder prior to Closing or termination of this Contract, Seller's sole and exclusive remedy shall be to terminate this Agreement by written notice to Purchaser; whereupon, Seller shall retain all Earnest Money and Option Money (if any) paid by Purchaser to Seller as liquidated damages. Thereafter, neither party shall have any further liability or obligation to the other hereunder.

**b.   Seller's Default.**   If Seller defaults on any of its obligations hereunder prior to Closing or termination of this Contract, Purchaser's sole and exclusive remedy shall be either: (a) to terminate this Agreement by written notice to Seller, whereupon Purchaser shall be entitled to recover all Earnest Money and Option Money (if any) paid to Seller, or (b) to seek specific performance of this Agreement by serving written notice of default on Seller and by instituting mandatory binding arbitration of Purchaser's claim of default and demand for specific performance in accordance with Section 15 above. Notwithstanding the foregoing, nothing in this subsection (b) shall limit the Purchaser's remedies in the event that Seller defaults under Section 16(f) of this Agreement.

**c.   <u>Post-Closing and Post-Termination Remedies.</u>**   Notwithstanding subsections a and b above, from and after the Closing or any termination of this Contract, each party shall have the right to pursue its actual (but not consequential or punitive) damages against the other party for breach of any covenant or agreement contained herein that expressly survives the Closing or termination of this Contract.

**19. TIME/DATE.**   The Effective Date of this Agreement shall be the date of signing of this Agreement by Seller. **Time is of the essence** as to the occurrence of all events, the satisfaction of all conditions and the performance of all obligations hereunder.

**20. RESTRICTIVE COVENANTS; HOMEOWNERS ASSOCIATION.**   Purchaser acknowledges receipt of a copy of that certain declaration of covenants, conditions and restrictions for **River Mill** Subdivision, together with all amendments thereto (collectively, the "Declaration"). Purchaser acknowledges that the Property is subject to the Declaration and that, upon purchase of the Property, Purchaser shall personally be subject to all the provisions of the Declaration, including but not limited to provisions requiring membership in and payment of assessments to any homeowners association for the Subdivision (the "Association"). Purchaser further acknowledges that the current regular assessment due to the Association is estimated to be **$525 per year**. Purchaser acknowledges that, in addition to the regular assessment, Purchaser shall be required to pay an initial fee or assessment to the Association at Closing in the amount of **$175.00**. Purchaser shall be required to pay an administrative transfer fee charged by the HOA or HOA management company, if any, in the amount of $125.

There will also be a $25 Service/Delivery Fee. PURCHASER FURTHER ACKNOWLEDGES THAT THE DECLARATION MAY BE AMENDED FROM TIME TO TIME AS PROVIDED THEREIN, AND THAT THE AMOUNTS TO BE PAID BY PURCHASER TO THE ASSOCIATION MAY CHANGE AT ANY TIME.

**21. SUCCESSORS AND ASSIGNS; INTERPRETATION.**   This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their heirs, successors, administrators, executors and assigns. Purchaser shall not have the right to assign Purchaser's interest in this Agreement. As required by context herein, the singular shall include the plural, and the neuter shall include the masculine and the feminine.

**22. ENTIRE AGREEMENT; AMENDMENT.**   This document contains the sole and entire agreement between the parties hereto with regard to the Property. All prior discussions have been merged into this Agreement. No representation, statement, promise or inducement shall be binding upon either party hereto unless specifically stated in this Agreement. This Agreement may not be modified except by a writing signed by both parties.

**23. SEVERABILITY.**   If any provision of this Agreement shall be declared invalid or unenforceable by laws applicable thereto, or unenforceable as to certain parties, then the performance of such provision shall be excused by the parties hereto and the remaining provisions of this Agreement shall remain in full force and effect.

**24. NO-WAIVER.**   Any failure or delay of Purchaser or Seller to enforce any term of this Agreement shall not constitute a waiver of such term, it being explicitly agreed that such a waiver must be specifically stated in a writing delivered to the other party in compliance with Section 28 below.   Any such waiver by Purchaser or Seller shall not be deemed to be a waiver of any other breach or of a subsequent breach of the same or any other term.

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1     126 RIVERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce          **Job: 708760019**

8:26-cv-00097-DCC     Date Filed 02/02/26     Entry Number 24-2     Page 11 of 35

25. **ADDENDA AND EXHIBITS.**

   a.   **Addenda.**   The following Addenda are attached hereto and incorporated herein:
   ☑ (1) Addendum 1, <u>Builder's Referral Incentives and Contributions Addendum</u>
   ☑ (2) Addendum 2, SELECT ONE:
      ☐ <u>New Construction</u>
      ☐ <u>New Construction (Express Homes)</u>
      ☐ <u>Construction in Progress</u>
      ☐ <u>Construction Completed</u>
   ☐ Addendum 3, <u>Current Residence Contingency</u>
   ☐ Addendum 4, <u>Co-Broker Addendum</u>
   ☐ Addendum 5, <u>Alternative Incentive Addendum</u>
   ☐ Addendum 6, <u>Special Stipulations</u>
   ☐ Addendum 7, <u>Model House</u>
   ☐ Addendum 8, <u>Design Center Voucher</u>
   ☐ Addendum 9, <u>Variations in Materials and Components</u>
   ☐ Community-Specific Addenda

   b.   **Exhibits.**   The following Exhibits are attached hereto and incorporated herein:
   ☐ Exhibit A, Included Features Sheet
   ☐ Exhibit B, Home Options
   ☐ *RESERVED*
   ☐ Exhibit D, Stages of Construction

**26. NOTICE.**   Except when specifically provided otherwise herein**,** any notices required to be given hereunder must be in writing. Notice shall be deemed delivered upon receipt or refusal if deposited in the United States Mail, Certified Mail, Return Receipt Requested, postage prepaid, properly addressed to the party to be served. Notice shall also be deemed given if delivered to the address for service of notice shown below by Federal Express, UPS or other nationally recognized overnight carrier service, with no signature or receipt required. Notice to Purchaser also shall be deemed given if delivered to the email address for service of notice shown under Purchaser's signature. Each party warrants that its correct mailing address for service of notice is shown below. Purchaser warrants that its correct telephone number and email address are shown below. A party may change its address for service of notice by giving the other party written notice of the change of address.

**27. EXCUSED DELAYS.**   Notwithstanding any other provision herein, if Seller is delayed in performing any of its obligations hereunder or meeting any specified completion dates by labor disputes, fire, delays in deliveries, adverse weather conditions, unanticipated damage to or destruction of the Property, governmental controls or moratoria, acts of God or any other causes beyond Seller's reasonable control, then the time-period specified herein for performance of such obligation and/or meeting such completion date shall be extended a sufficient number of working days to enable and allow Seller to perform and/or complete the obligation. Notwithstanding the foregoing, nothing in this Section 27 shall be construed as limiting the Seller's obligations under Section 16(f) of this Agreement.

**28. OFFER.**   This instrument shall be regarded as an offer by the first party to sign until fully executed by both parties, at which time it shall become binding on both parties.

**29. ELECTRONIC SIGNATURES AND TRANSMISSIONS.**   This Agreement may be executed by electronic means via DocuSign. Such signatures shall be deemed to constitute originals for all purposes hereunder. In addition, if either party transmits executed documents in electronic format via facsimile or email, then the other party may rely upon such documents as if they were executed originals.

   **WHEN SIGNED BY BOTH PARTIES, THIS DOCUMENT WILL BECOME A BINDING CONTRACT IMPOSING LEGALLY ENFORCEABLE OBLIGATIONS UPON YOU. SELLER'S SALES REPRESENTATIVE DOES NOT HAVE AUTHORITY TO EXECUTE THIS CONTRACT ON BEHALF OF SELLER OR OTHERWISE BIND SELLER. IF YOU DO NOT FULLY UNDERSTAND THIS DOCUMENT OR IF YOU DO NOT FEEL IT MEETS YOUR NEEDS, YOU SHOULD CONSULT A SOUTH CAROLINA REAL ESTATE ATTORNEY BEFORE SIGNING IT.**

IN WITNESS WHEREOF, the parties hereto have executed this Home Purchase Agreement on the dates indicated below.

**PURCHASER:**

*William D Wyatt*
068552426B1B402...
_____     5/7/2020
**Buyer:** William D Wyatt          Date

*Jeanne M. Wyatt*
B3E22D99794D482...
_____     5/7/2020
**Co-Buyer:** Jeanne M. Wyatt          Date

<u>Purchaser's Current Mailing Address:</u>
57 Acadia Drive
Rockland, ME     04841

**SELLER:**

**D.R. Horton, Inc., a Delaware Corporation**

*Sara Bouchillon*
FEF4457F381C421...
_____     5/11/2020
Sara Bouchillon          Date

Officer, D.R. Horton

<u>Seller's Address:</u>

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1     126 RIVERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce     Job: **708760019**

**8:26-cv-00097-DCC**    **Date Filed 02/02/26**    **Entry Number 24-2**    **Page 12 of 35**

US
Purchaser's Home Phone: <u>(207) 415-1775</u>
         Mobile Phone:
         Work Phone:
Purchaser's Email: <u>wdwyatt@wdwyatt.com</u>

<u>Co-Buyer's Current Mailing Address</u>:
57 Acadia DriveRockland, ME 04841
Co-Buyer's Home Phone:
         Mobile Phone:
         Work Phone:
Co-Buyer's Email: jmwyatt@wdwyatt.com

D.R. Horton, Inc., a Delaware Corporation
100 Verdae BlvdSuite 401
Greenville, SC    29607
**MAIN:** (864) 757-9930

*For Internal Purposes Only:*
Seller's Sales Representative:

*Mary J Pearce*
AEFC0EE1E6D046A...
                          5/7/2020
**Sales Rep:** Mary Jeanette Pearce    Date

*Thomas G Henderson*
F7421166EDC441D...
                          5/7/2020
**Sales Rep:** Thomas Gary Henderson   Date

**Buyer(s):** William D Wyatt and Jeanne M. Wyatt, **Community:** River Mill, **Plat:** //, **Address:** 126 RIVERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce

**Job: 708760019**
**Printed:** 5/7/2020

# FHA REAL ESTATE CERTIFICATION

This certification is attached to and made part of that certain Home Purchase Agreement (the "Agreement") by and between D.R. Horton, Inc., a Delaware Corporation, as Seller, and William D Wyatt and Jeanne M. Wyatt, as Purchaser, for the purchase and sale of Lot 0019, Block/Phase , River Mill Subdivision in ANDERSON, SC.  Capitalized terms not otherwise defined herein shall have the same meanings as ascribed to them in the Agreement.

**Purchaser, Seller, and Co-Broker hereby certify that (1) the terms and conditions of the Agreement are true to the best of their knowledge and belief, and (2) any other agreement entered into by any of these parties in connection with this real estate transaction is part of, or attached to, the Agreement.**

**PURCHASER:**

*William D Wyatt*
068552426B1B402...
_____    5/7/2020
**Buyer:** William D Wyatt      Date

*Jeanne M. Wyatt*
B3E22D99794D482...
_____    5/7/2020
**Co-Buyer:** Jeanne M. Wyatt      Date

**SELLER:**

**D.R. Horton, Inc., a Delaware Corporation**

*Sara Bouchillon*
FEF4457F381C421...
_____    5/11/2020
Sara Bouchillon      Date
Officer, D.R. Horton

**CO-BROKER:**

FHA Real Estate Certification

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1     6 RIVERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce     Job: **708760019**

8:26-cv-00097-DCC     Date Filed 02/02/26     Entry Number 24-2     Page 14 of 35

# EXHIBIT B
# HOME OPTIONS

Seller will include in the House the following options and upgrades selected by Purchaser (the "Initial Options") at the prices indicated below. Payment for the Initial Options in the amount stated below must be made to Seller simultaneously with the execution of this Agreement; such payment for the Initial Options, and any and all future payments made by Purchaser for options or upgrades in advance of Closing, are collectively referred to in this Agreement as "Option Money." Option Money paid to Seller shall not be held in escrow, and shall be nonrefundable to Purchaser, except in the event of material breach of this Agreement by Seller or as otherwise provided in this Agreement. Upon Closing, all Option Money previously paid to Seller shall be credited to Purchaser against the Purchase Price.

In the event Seller omits the installation of any Initial Option in the House, Seller's responsibility shall be limited to a refund of the applicable price or allowance stated below. Any such omission shall not invalidate this Agreement, constitute a breach of its terms or give rise to any claim for damages against Seller. In the event any Initial Option or option selected by Purchaser at a later date is discontinued, Seller reserves the right to substitute an item or brand of equal value.

The Initial Options are as follows:

## Selected Options

| DEC – Deco Options | | | | | | | |
|---|---|---|---|---|---|---|---|
| Option # | Rev. # | Rev. Date | User | Qty. | Unit Price | Ext. Price | |
| 04006000<br>**Color:**<br>STRUCTURED WIRING - TV/CABLE -PER LOCATION -- | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $ 95.00 | $ 95.00 | P |
| 04121000<br>**Color:**<br>HOME AUDIO - HD LINK 25 | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $ 625.00 | $ 625.00 | P |
| 17001220<br>**Color:** Brellin White<br>CABINET BASE - KITCHEN - D2 - LVL2 | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $1,595.00 | $1,595.00 | P |
| 17009220<br>**Color:** Brellin White<br>CABINET BASE - BATHS - D2 - LVL2 | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $ 535.00 | $ 535.00 | P |
| 17013220<br>**Color:** Brellin white<br>BATH 3 - UPGRADE CABINET - D2 - LVL2 | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $ 220.00 | $ 220.00 | P |
| 17507000<br>**Color:**<br>GLASS DOOR - PER DOOR - CLEAR GLASS | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** corner cabinet | 1.0000 | $ 250.00 | $ 250.00 | P |
| 22340020<br>**Color:**<br>2 PENDANT LIGHTS W/ SWITCH | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $ 300.00 | $ 300.00 | P |
| 35000101<br>**Color:** temple stone<br>CARPET L1 DR164-LONGVIEW ISLE WITH 6LB PAD | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $ 0.00 | $ 0.00 | P |
| 36001000<br>**Color:** CA23 18x18 straight lay<br>FLOORING - UPGRADE TILE | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** master bath, bath 2 | 1300.0000 | $ 1.00 | $1,300.00 | P |
| 37000203<br>**Color:**<br>992 CLOUDLAND - GUARDACOR VINYL FLOOR<br><br>Note: This Option identifies the Style/Color of the Standard Vinyl Flooring in the Home. | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** upstairs bath | 1.0000 | $ 0.00 | $ 0.00 | P |
| 39002201<br>**Color:** Fresh Bark<br>D2 DRW32 6" WESTWICK REVWOOD FLOORING - LEVEL 2  foyer, powder, dining, kitchen/breakfast, garage entry, family, laundry | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 3072.0000 | $ 1.00 | $3,072.00 | P |
| 49001030<br>**Color:** EL40 4x16 1/3 offset<br>KITCHEN BACKSPLASH - CERAMIC TILE - LEVEL 3 | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $ 375.00 | $ 375.00 | P |
| 56102000<br>**Color:**<br>BLINDS - 2" WHITE-WHOLE HOUSE<br><br>NOTE: This option does NOT include Blinds on any doors. | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $1,800.00 | $1,800.00 | P |
| 60022020<br>**Color:** CA23 12x12 straight lay<br>TILE SURROUND - OWNERS SHOWER - LEVEL 2 | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** tile pan | 1.0000 | $ 200.00 | $ 200.00 | P |
| 95002000<br>**Color:**<br>GARAGE DOOR OPENER (1/2 HP) | 0 | 05/07/2020 | Thomas Gary Henderson<br>**Location:** | 1.0000 | $ 400.00 | $ 400.00 | |

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1

6 RIVERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce    **Job:** 708760019

Sub-Total    **$10,767.00**

| **POS – Point of Sale Options** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Option # | Rev. # | Rev. Date | User | | Qty. | Unit Price | Ext. Price |
| 00021001 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $2,900.00 | $2,900.00 | P |
| **Color:** | | | | **Location:** | | | |
| GARAGE - 4' EXTENSION - MONO | | | | | | | |
| 00100200 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $29,900.00 | $29,900.00 | P |
| **Color:** | | | | **Location:** | | | |
| 2ND FLOOR - D2 | | | | | | | |
| 00124001 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $2,500.00 | $2,500.00 | P |
| **Color:** | | | | **Location:** | | | |
| BEDROOM 3 EXTENSION - MONO | | | | | | | |
| 00207000 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $1,200.00 | $1,200.00 | P |
| **Color:** | | | | **Location:** | | | |
| TREY - FOYER | | | | | | | |
| 00216300 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 500.00 | $ 500.00 | P |
| **Color:** | | | | **Location:** | | | |
| CATHEDRAL CEILING - BEDROOM #3 | | | | | | | |
| 25005241 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $2,450.00 | $2,450.00 | P |
| **Color:** | | | | **Location:** | | | |
| MFC2062FEZ - 20CF MAYTAG COUNTER DEPTH FRENCH DOOR REFRIGERATOR -S.S. | | | | | | | |
| 25007022 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $2,400.00 | $2,400.00 | P |
| **Color:** | | | | **Location:** | | | |
| FRONT LOAD WHIRLPOOL WASHER & ELECTRIC DRYER PACKAGE - WHITE | | | | | | | |
| Includes the following WHITE Appliances: WFW560CHW - Front Load Washer WED5620HW - Electric Dryer WFP2715HW - Pedestal (2) For Washer & Dryer | | | | | | | |
| 54103200 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $2,000.00 | $2,000.00 | P |
| **Color:** | | | | **Location:** | | | |
| LUXURY OWNERS SHOWER - D2 | | | | | | | |

Sub-Total    **$43,850.00**

| **STD – Standard Options** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Option # | Rev. # | Rev. Date | User | | Qty. | Unit Price | Ext. Price |
| 000000D2 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** | | | | **Location:** | | | |
| D2 SERIES HOME | | | | | | | |
| 00001001 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** | | | | **Location:** | | | |
| FOUNDATION - MONOLITHIC SLAB | | | | | | | |
| 00202000 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** | | | | **Location:** | | | |
| TREY - OWNER'S SUITE | | | | | | | |
| 00475000 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** black slate | | | | **Location:** | | | |
| FIREPLACE | | | | | | | |
| 04000200 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** | | | | **Location:** | | | |
| HOME IS CONNECTED PACKAGE | | | | | | | |
| THIS PACKAGE CONSISTS OF THE FOLLOWING SMART HOME DEVICES; A. ALARM.COM APP B. ONE QOLSYS IQ TOUCHSCREEN PANEL C. HONEYWELL T6 PRO Z-WAVE THERMOSTAT(S) - PER PLAN D. ONE AMAZON ECHO DOT E. ONE AMAZON ECHO SHOW 5 F. ONE KWIKSET SMARTCODE 888 DEADBOLT - FRONT DOOR G. ONE EATON Z-WAVE LIGHT SWITCH - FRONT PORCH LIGHT(S) H. ONE SKYBELL VIDEO DOORBELL - FRONT DOOR | | | | | | | |
| 18001010 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** LUNA PEARL | | | | **Location:** | | | |
| GRANITE COUNTERTOP BASE - KITCHEN - LVL1 | | | | | | | |
| 18009010 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** LUNA PEARL | | | | **Location:** | | | |
| GRANITE COUNTERTOP BASE - BATHS - LVL1 | | | | | | | |
| 22214010 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** | | | | **Location:** | | | |
| STEFAN LIGHT PACKAGE - BRUSHEDNICKEL FINISH | | | | | | | |
| 25001010 | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** | | | | **Location:** | | | |
| CLASSIC FRIGID. GAS APPLIANCE PACKAGE - S.S. | | | | | | | |
| Includes the following STAINLESS Appliances: FFGF3054TS - 30" Gas Freestanding Range FFID2426TS - Built-In Dishwasher FFMV1645TS - OTR Microwave Model Transition on homes Started after Jan. 1, 2018 | | | | | | | |
| JSPK001Z | 0 | 05/07/2020 | Thomas Gary Henderson | | 1.0000 | $ 0.00 | $ 0.00 | P |
| **Color:** | | | | **Location:** | | | |
| IRRIGATION SYSTEM-1ST TWO ZONES | | | | | | | |

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1

6 RIVERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce

**Job:** **708760019**

| | | |
|---|---|---|
| Sub-Total | $ | 0.00 |
| **Total:** | **$54,617.00** | |

## Color Selections

### 17 – Cabinets

| Option # | Color | Rev. # | Rev. Date | User |
|---|---|---|---|---|
| CABINETS - HARDWARE | H315 | 0 | 05/07/2020 | |
| **Location:** | | | | |
| **Notes:** | | | | |

### 97 – Color Options

| Option # | Color | Rev. # | Rev. Date | User |
|---|---|---|---|---|
| EXT. COLOR PACKAGE | | 0 | 05/07/2020 | |

The Following Colors are to be Installed on the Home Where the Applicable Material is Shown by Plan & Elevation: HARDI LAP SIDING = Iron Gray HARDI SHAKE SIDING = Khaki Brown HARDI BOARD & BATTEN SIDING = Navajo Beige FASCIA, SOFFIT, FLASHING, VINYL TRIM / VENTS = White TRIM, CORNER BOARD & GARAGE DOOR JAMB = Arctic White CORBELS / COLUMNS = SW7056 Reserved White FRONT DOOR & SHUTTERS = Chocolate GARAGE DOOR, GUTTERS & DOWNSPOUTS, WINDOWS = White SHINGLES= Weathered Wood METAL ROOF = Matte Black BRICK = Spanish Moss STONE = Tennessee
**Location:**
**Notes:**

### 53 – Interior Paint/Trim

| Option # | Color | Rev. # | Rev. Date | User |
|---|---|---|---|---|
| Interior Paint Color - Walls and Ceilings | divine white | 0 | 05/07/2020 | |
| **Location:** | | | | |
| **Notes:** | | | | |

### 54 – Vanity/Tub/Shower

| Option # | Color | Rev. # | Rev. Date | User |
|---|---|---|---|---|
| SHOWER DOOR - MASTER | chrome | 0 | 05/07/2020 | |
| **Location:** | | | | |
| **Notes:** | | | | |

Purchaser acknowledges that, upon execution of this Agreement, Purchaser shall be required to pay Option Money in the amount of **$ 0.00** for the Initial Options.

DocuSigned by:

*William D Wyatt*
068552426B1B402...
_____  5/7/2020
**Buyer:** William D Wyatt   Date

DocuSigned by:

*Jeanne M. Wyatt*
B3E22D99794D482...
_____  5/7/2020
**Co-Buyer:** Jeanne M. Wyatt   Date

**SELLER:**
**D.R. Horton, Inc., a Delaware Corporation**

DocuSigned by:

*Sara Bouchillon*
FEF4457F381C421...
_____  5/11/2020
Sara Bouchillon   Date

Officer, D.R. Horton

DocuSigned by:

*Mary J Pearce*
AEFC0EE1E6D046A...
_____  5/7/2020
**Sales Rep:** Mary Jeanette Pearce   Date

*For Internal Purposes Only*:

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1     6 RIVERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce     **Job: 708760019**

8:26-cv-00097-DCC     Date Filed 02/02/26     Entry Number 24-2     Page 17 of 35



**EXHIBIT D**
**STAGES OF CONSTRUCTION**

This Exhibit is attached and made part of the Home Purchase Agreement ("Agreement") by and between **D.R. Horton, Inc., a Delaware Corporation**, as Seller, and **William D Wyatt and Jeanne M. Wyatt**, as Purchaser, for the purchase and sale of Lot _, Block/Phase **0019**, of **River Mill** Subdivision (the "Property"). Any capitalized terms used in this Exhibit shall have the same meanings as ascribed to them in the Agreement or the other exhibits and addenda thereto. In the event of a conflict between this Exhibit and the Agreement, this Exhibit shall control.  The parties hereby agree as follows:

1.  STRUCTURAL FEATURES AND OPTIONS TO BE INCLUDED IN THE HOUSE MUST BE LISTED ON EXHIBIT A OR B AT THE TIME SELLER EXECUTES THE AGREEMENT.  Structural features and options include, without limitation, the following:  **plan elevation, floor plan options, foundation type (slab/basement), bedrooms, bathrooms, bonus rooms, media rooms, sunrooms, porches, garages, windows, exterior doors, and fireplaces**.

Initials     WDW     JMW
Buyer     Co-Buyer

2.  The parties hereby agree that the box checked below indicates the approximate stage of construction of the House as of **05/07/2020**, according to the most recent report from Seller's superintendent.

**Stage of Construction**

☐ Prior to Seller Release to Construction (Prior to Stage 00)

☐ 00 Permit/Planning Stage

☐ 01 Foundation Layout/Trench Stage

☐ 02 Foundation Poured Stage

☐ 02A Snap First Floor

☐ 03 Frame Stage

☐ 03A Load Trusses

☐ 04 Exterior Finish Stage

☐ 05 Mechanicals Rough Stage

☐ 06 Insulation/Drywall Stage

☐ 07 Interior Finish Stage

☐ 08 Mechanicals Final Stage

☐ 09 Flooring/Final Touches Stage

☐ 10 Final Inspection Performed

☐ 11 Certificate of Occupancy received

☐ 12 Quality Control Walk Performed

Construction stages listed above are approximations and may vary from the actual construction process for the particular home. PURCHASER ACKNOWLEDGES THAT CONSTRUCTION OF THE HOUSE IS (OR SOON WILL BE) UNDERWAY AND THAT, AS CONSTRUCTION PROGRESSES, FURTHER OPTIONS WILL BE FORECLOSED AS STATED IN THE CHART BELOW. PURCHASER ACKNOWLEDGES THAT IT IS PURCHASER'S SOLE OBLIGATION TO TIMELY REQUEST ANY CHANGES BASED ON THE CUT-OFFS IDENTIFIED IN THE CHART BELOW.

Initials     WDW     JMW
Buyer     Co-Buyer

| Option Selection - Milestone Stage Cutoffs (Rev: Sept. 2019) | Permit Planning Stage | Foundation Layout/ Trench Stage | Foundation Poured Stage | Framing Stage | Exterior Finish (Framing) Stage | Mechanicals Rough Stage | Insulation/ Drywall Stage | Quality Control Walk Performed |
|---|---|---|---|---|---|---|---|---|
| **Milestones** | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 12 |

Page **1** of **2**          Exhibit D - Stages of Construction (Express)
(rev. September 2019)

| Options Available | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Structural Options | No | No | No | No | No | No | No | No |
| Brick / Stone / Foundation | No | No | No | No | No | No | No | No |
| Deluxe Bath Options (if applicable) | No | No | No | No | No | No | No | No |
| Exterior Color Selections | No | No | No | No | No | No | No | No |
| Countertops - Granite | No | No | No | No | No | No | No | No |
| Gas Appliances (if applicable) | No | No | No | No | No | No | No | No |
| Flooring Selections | No | No | No | No | No | No | No | No |
| Washer / Dryer | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Blinds | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Refrigerator | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

Notwithstanding the foregoing and subject to the provisions of Addendum 2 to the Agreement, Seller may, in Seller's sole discretion, decline to permit any changes to the House after the Design Center Selection Meeting (if applicable) or the Effective Date, whichever is later.

**PURCHASER:**                                    **SELLER:**

*William D Wyatt*
068552426B1B402...                               **D.R. Horton, Inc., a Delaware Corporation**
_____  5/7/2020          *Sara Bouchillon*
**Buyer:** William D Wyatt     Date              FEF4457F381C421...
                                                 _____  5/11/2020
*Jeanne M. Wyatt*                                Sara Bouchillon          Date
B3E22D99794D482...
_____  5/7/2020          Officer, D.R. Horton
**Co-Buyer:** Jeanne M. Wyatt   Date


*Mary J Pearce*
AEFC0EE1E6D046A...                               *For Internal Purposes Only:*
_____  5/7/2020
**Sales Rep:** Mary Jeanette Pearce   Date

Page **2** of **2**       Exhibit D - Stages of Construction (Express)
                          (rev. September 2019)

Buyer(s): William D Wyatt and Jeanne M. Wyatt, Community: River Mill, Plan: H, Address: 239 W. River St, PLACE, Sales Rep: Mary Jeanette Scaife
Job: 708760019
Printed: 5/7/2020




ADDENDUM 1
**BUILDER'S REFERRAL INCENTIVES AND CONTRIBUTIONS ADDENDUM**

This **ADDENDUM** is attached to and made a part of that Home Purchase Agreement between **D.R. Horton, Inc., a Delaware Corporation**, as Seller, and **William D Wyatt and Jeanne M. Wyatt**, as Purchaser (the "Purchase Agreement"), regarding that parcel of real estate located in **ANDERSON** County, **SC**, briefly described as Lot **0019**, **River Mill**, and referred to in the Purchase Agreement as the "Lot."  All terms defined in the main text of the Purchase Agreement shall have the same meanings when used in this Addendum. This Addendum, together with the Purchase Agreement, constitutes the sole and entire agreement between Seller and Purchaser with regard to any incentives, allowances, adjustments, credits, discounts, rebates or other contributions of any kind or amount (collectively, the "Referral Incentives and Contributions") made, or to be made, by Seller to Purchaser in connection with Seller's referral of Purchaser to SELLER'S PREFERRED MORTGAGE LENDER(S) DESCRIBED BELOW ("PREFERRED LENDER"), and there are no agreements regarding such Referral Incentives and Contributions, whether written or unwritten, expressed or implied, between the parties except as set forth in this Addendum.  In the event of any conflict between the terms and provisions of this Addendum and the terms and provisions of the main text of the Purchase Agreement, the terms and provisions of this Addendum shall control.

Purchaser acknowledges receipt of that document entitled, "Notice of Seller's Business Affiliations" (the "Affiliation Notice"), and Purchaser confirms its understanding that Seller has an affiliation with DHI MORTGAGE COMPANY, LTD. ("DHI MORTGAGE") and that Purchaser is not required to use this affiliated company or any Preferred Lender (described below) as a condition of Purchaser's purchase of the Property or Purchaser's access to settlement services in connection with the purchase of the Property. The parties state, acknowledge and agree as follows:

1. Seller shall provide for the benefit of Purchaser the Referral Incentives and Contributions listed in Section 2 below, **provided that** Purchaser chooses to use PREFERRED LENDER to finance the purchase of the Property and **provided that each and all of the following occur**:

> **a**. Purchaser applies to PREFERRED LENDER for a mortgage loan to finance the purchase of the Property within the timeframe required under Section 2(b) of this Purchase Agreement;

> **b**. Purchaser's loan application is approved by PREFERRED LENDER, and PREFERRED LENDER actually funds the loan and finances the purchase of the Property;

> **c**. Purchaser closes on the purchase of the Property on or before the final date and time for Closing set by Seller pursuant to subsection 16(a) of the Purchase Agreement; and

> **d**. Purchaser uses the closing attorney recommended by Seller to act as settlement agent and close the purchase of the Property.

2. Provided that all the above conditions are satisfied and met in a timely manner, Purchaser shall be entitled to a contribution from Seller towards Purchaser's closing costs in an amount up to the lesser of: (a) three percent (3.00%) of the final Purchase Price, or (b) **$9,360.00** Dollars. This contribution, up to the applicable limit, shall be applied against closing costs actually charged to Purchaser, in the following order (as applicable): Origination Charge, Origination Fee, Upfront Unfinanced Mortgage Insurance (if applicable).

If any of the maximum amount of contribution remains unapplied after payment of all of the above listed closing costs, then the remainder shall be applied against other usual and customary closing costs actually charged to Purchaser by other settlement service providers.  Notwithstanding the foregoing: (i) any contribution by Seller to Purchaser's closing costs shall be subject to Purchaser's loan program and any lender guidelines or restrictions, (ii) no portion of the maximum amount of contribution may be applied as a credit to, or in partial payment of, the Purchase Price of the Property or disbursed to Purchaser, and (iii) any unapplied portion of the maximum amount of contribution shall be forfeited by Purchaser.

3. Preferred Lender.  The PREFERRED LENDER relating to this Builder's Referral Incentive and Contributions Addendum is DHI Mortgage.  More information regarding DHI Mortgage is available at: www.dhimortgage.com.

**Purchaser's decision to use any lender other than PREFERRED LENDER will not affect any concessions, incentives or discounts offered by Seller for the purchase of the Property other than the closing cost contributions described in Section 2 above.**

**IN WITNESS WHEREOF, THE UNDERSIGNED, HAVING READ AND REVIEWED THIS ADDENDUM, HAVE SIGNED THIS ADDENDUM ON THE DATE SHOWN BELOW.**

**Purchaser:**

*William D Wyatt*
068552426B1B402...
_____   5/7/2020
**Buyer:** William D Wyatt         Date

*Jeanne M. Wyatt*
B3E22D99794D482...
_____   5/7/2020
**Co-Buyer:** Jeanne M. Wyatt      Date

**Seller:**

**D.R. Horton, Inc., a Delaware Corporation**

*Sara Bouchillon*
FEF4457F381C421...
_____   5/11/2020
Sara Bouchillon                Date
Officer, D.R. Horton

Page 1 of 1

(rev. 28-Dec-2016)

## ADDENDUM 2
## NEW CONSTRUCTION

This Addendum is attached to and made a part of that Home Purchase Agreement (the "Agreement") between **William D Wyatt and Jeanne M. Wyatt**, as Purchaser, and **D.R. Horton, Inc., a Delaware Corporation**, as Seller, regarding that parcel of land located in **ANDERSON** County, **ANDERSON**, briefly described as Lot  **- River Mill** Subdivision and referred to in the Agreement as the "Lot." All terms defined in the main text of the Agreement shall have the same meanings when used in this Addendum. Purchaser and Seller further agree as follows:

**1. CONSTRUCTION OF HOUSE.** Prior to Closing, Seller shall construct a ⊘ single-family detached / ◯ townhouse residence (the "House") on the Lot. Seller shall not be required to commence construction of the House unless and until: (a) the Loan has been approved by Purchaser's lender to Seller's satisfaction (if financing contingency selected in Section 2 of the Agreement); (b) Purchaser has paid all amounts then due to Purchaser's lender and to Seller; (c) all contingencies to Purchaser's performance hereunder have been satisfied or removed to Seller's satisfaction; and (d) Purchaser has completed its selection of all colors and options for the House.

**2. HOUSE PLAN.** Seller shall construct the House according to the **COASTAL** Plan, Elevation **G**, including those features and options listed on Exhibit A and Exhibit B to this Agreement, ⊘ on a slab ◯ on a crawl space ◯ over a basement ( the "Base Plan"). Seller's obligation to construct the House shall be contingent on Seller's ability: (a) to place the House on the Lot without obtaining variances from any set-backs or other dimensional requirements, and (b) to construct the House on the Lot without incurring abnormal costs for foundation, slab or structural support walls. If Seller determines that either of these contingencies cannot be satisfied to Seller's satisfaction, then Seller may terminate this Agreement upon written notice to Purchaser, in which event the Earnest Money and the Option Money (if any) shall be refunded to Purchaser. Seller shall determine the placement and orientation of the House on the Lot in Seller's sole discretion. Purchaser acknowledges that the House shall be handmade and unique, and that although the House shall be based on the Base Plan, variations from the Base Plan will occur. Seller shall not be responsible for such variations from the Base Plan. Purchaser also acknowledges that brochures, collateral and marketing materials, models and displays used by Seller's sales agents are for general illustrative purposes only, and are not to be relied upon as representations of actual locations, dimensions, specifications or finished products. Subject only to the provisions of 9.c and 14 of this Agreement, Closing shall constitute acceptance of the House by Purchaser AS BUILT, and Purchaser hereby waives any right to object to any variation in construction from the Base Plan after Closing. Purchaser further acknowledges and agrees that Seller may remove or retain any trees and other vegetation currently existing on the Property if, in Seller's sole discretion, Seller determines that such removal or retention is necessary or desirable in connection with the development of the Property or the Subdivision.

**3. HEATING AND AIR CONDITIONING.** The House shall be adequately and efficiently heated and air-conditioned with equipment having at least the minimum specifications for the House as established by applicable building and construction codes. The clothes dryer shall vent to the outside.

**4. INSULATION.** Insulation shall be installed in the House to at least the following minimum standards**:** (a) exterior walls, excluding exterior garage walls, to be insulated with BATT insulation to a thickness of 3 5/8 inches which will, according to the manufacturer, yield an R-value of 13: (b) ceilings below attic areas to be insulated with BLOWN insulation to a thickness of 13 inches which will, according to the manufacturer, yield an R-value of 30; (c) vaulted ceilings to be insulated with BATT insulation to a thickness of 6 1/4 inches which will, according to the manufacturer, yield an R-value of 19; and (d) floor overhangs to be insulated with BATT insulation to a thickness of 3 5/8 inches which will, according to the manufacturer, yield an R-value of 13.

**5. DESIGN CENTER; MANDATORY SELECTION MEETING; OPTION MONEY.** Within five (5) business days after the Effective Date, Purchaser and Seller's representative will meet at Seller's Design Center, located at Seller's address specified in the Agreement, to select and confirm all options to be used in the construction of the House, including all colors and finishes. Seller shall schedule this meeting (the "Selection Meeting") during normal working hours and shall give Purchaser at least twenty-four (24) hours prior notice of the scheduled date and time by telephone and/or email. If Purchaser fails to attend the Selection Meeting and complete selection of all options at the Selection Meeting, then Seller may terminate this Agreement upon written notice to Purchaser, in which event Seller shall retain all Earnest Money and Option Money previously deposited by Purchaser. At the conclusion of the Selection Meeting, Seller and Purchaser shall execute a Design Center Amendment to this Agreement which shall specify all options chosen by Purchaser and any corresponding change to the Purchase Price. If the cost of options selected by Purchaser exceeds Ten Thousand Dollars ($10,000), then Purchaser shall pay to Seller, at the time of execution of the Design Center Amendment, three-quarters (3/4) of the excess cost of the selected options as additional Option Money (as defined in Exhibit B).

**6. CHANGES.** Seller may, but shall not be required to, allow changes to the House after the execution of the First Amendment to this Agreement. All changes requested by Purchaser shall be subject to the Stages of Construction Exhibit attached to this Agreement ==and limited to one change order after the Design Center Appointment (if applicable) or initial Contract if a Design Center Appointment does not apply.== If Purchaser requests a change in the House and Seller agrees to the change, Purchaser shall pay to Seller a Change Fee in the amount of ==Five Hundred and 00/100 Dollars ($500.00)== ==for each such change== at the time the request is approved by Seller. Any Change Fee paid shall be nonrefundable and shall not be credited against the Purchase Price. Any changes shall not be effective unless evidenced by a written amendment to this Agreement. At the time of execution of that amendment, Purchaser shall pay to the Seller the total increase in the Purchase Price resulting from the changes as additional Option Money. Purchaser recognizes that any such changes may affect the timing of Seller's completion of the House.

**7. COMPLETION.** Subject to the contingencies stated herein, Seller shall complete construction of the House prior to Closing. Seller shall construct the House according to all applicable governmental codes and regulations. Seller reserves the right to substitute materials or items to be used in the construction of the House with materials or items of equal or comparable value. Construction of the House shall be deemed complete when a certificate of occupancy is issued for the House by the applicable governmental authority. Seller shall deliver the completed House to Purchaser at Closing in "broom-clean" condition, ready to occupy. The House and Lot shall be free of all trash and debris.

**8. PURCHASER'S INQUIRIES.** Purchaser shall direct all inquiries and questions to Seller's on-site associate. The on-site associate will provide Purchaser with timely responses; however, the associate does not and shall not have authority to change the terms of this Agreement in any manner. This Agreement may be changed or modified only by a written amendment duly executed by both Purchaser and Seller. Purchaser acknowledges that Seller's sales associates, superintendents, closing staff, warranty staff and other employees **do not** have authority to modify this Agreement. Only an authorized corporate officer of Seller may modify this Agreement on Seller's behalf.

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1    VERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce                    **Job: 708760019**

8:26-cv-00097-DCC    Date Filed 02/02/26    Entry Number 24-2    Page 21 of 35

IN WITNESS WHEREOF, THE UNDERSIGNED, HAVING READ AND REVIEWED THIS ADDENDUM, HAVE SIGNED THIS ADDENDUM ON THE DATES SHOWN BELOW.

**PURCHASER:**

*DocuSigned by:*
*William D Wyatt*
068552426B1B402...                              5/7/2020
**Buyer:** William D Wyatt                         Date

*DocuSigned by:*
*Jeanne M. Wyatt*
B3E22D99794D482...                              5/7/2020
**Co-Buyer:** Jeanne M. Wyatt                      Date

**SELLER:**

**D.R. Horton, Inc., a Delaware Corporation**
*DocuSigned by:*
*Sara Bouchillon*
FEF4457F381C421...                              5/11/2020
Sara Bouchillon                                Date
Officer, D.R. Horton

*For Internal Purposes Only:*
Seller's Sales Representative:

*DocuSigned by:*
*Mary J Pearce*
AEFC0EE1E6D046A...                              5/7/2020
**Sales Rep:** Mary Jeanette Pearce                Date

*DocuSigned by:*
*Thomas G Henderson*
F7421166EDC441D...                              5/7/2020
**Sales Rep:** Thomas Gary Henderson               Date

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1     VERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce     Job: **708760019**

8:26-cv-00097-DCC     Date Filed 02/02/26     Entry Number 24-2     Page 22 of 35

**ADDENDUM 2**
**CONSTRUCTION IN PROGRESS**

This Addendum is attached to and made a part of that Home Purchase Agreement (the "Agreement") between **William D Wyatt and Jeanne M. Wyatt**, as Purchaser, and **D.R. Horton, Inc., a Delaware Corporation**, as Seller, regarding that parcel of land located in **ANDERSON** County, **ANDERSON**, briefly described as Lot , **River Mill** Subdivision and referred to in the Agreement as the "Lot." All terms defined in the main text of the Agreement shall have the same meanings when used in this Addendum. Purchaser and Seller further agree as follows:

**1. CONSTRUCTION OF HOUSE.** Prior to Closing, Seller shall complete construction of a ⊘ single-family detached / ⭘ townhouse residence (the "House") on the Lot. Seller shall not be required to restart construction of the House unless and until: (a) the Loan has been approved by Purchaser's lender to Seller's satisfaction; (b) Purchaser has paid all amounts then due to Purchaser's lender and to Seller; (c) all contingencies to Purchaser's performance hereunder have been satisfied or removed to Seller's satisfaction; and (d) Purchaser has completed its selection of all colors and options for the House.

**2. HOUSE PLAN.** Seller shall construct the House according to the **COASTAL** Plan, Elevation **G**, including those features and options listed on Exhibit A and Exhibit B to this Agreement, ⊘ on a slab ⭘ on a crawl space ⭘ over a basement ( the "Base Plan"). Seller's obligation to construct the House shall be contingent on Seller's ability: (a) to place the House on the Lot without obtaining variances from any set-backs or other dimensional requirements, and (b) to construct the House on the Lot without incurring abnormal costs for foundation, slab or structural support walls. If Seller determines that either of these contingencies cannot be satisfied to Seller's satisfaction, then Seller may terminate this Agreement upon written notice to Purchaser, in which event the Earnest Money and the Option Money (if any) shall be refunded to Purchaser. Seller shall determine the placement and orientation of the House on the Lot in Seller's sole discretion. Purchaser acknowledges that the House shall be handmade and unique, and that although the House shall be based on the Base Plan, variations from the Base Plan will occur. Seller shall not be responsible for such variations from the Base Plan or changes to the Base Plan standard features made prior to Closing. Standard features of the Base Plan are subject to change without notice or obligation. Purchaser also acknowledges that brochures, models and displays used by Seller's sales agents are for general illustrative purposes only, and are not to be relied upon as representations of actual locations, dimensions, specifications or finished products. Subject only to the provisions of subsections 9.d and 14 of this Agreement, Closing shall constitute Purchaser's acceptance of the House AS BUILT, and Purchaser hereby waives any right to object to any variation in construction from the Base Plan after Closing. Purchaser further acknowledges and agrees that Seller may remove or retain any trees and other vegetation currently existing on the Property if, in Seller's sole discretion, Seller determines that such removal or retention is necessary or desirable in connection with the development of the Property or the Subdivision.

**3. HEATING AND AIR CONDITIONING.** The House shall be adequately and efficiently heated and air-conditioned with equipment having at least the minimum specifications for the House as established by applicable construction and building codes. The clothes dryer shall vent to the outside.

**4. INSULATION.** Insulation shall be installed in the House to at least the following minimum standards**:** (a) exterior walls, excluding exterior garage walls, to be insulated with BATT insulation to a thickness of 3 5/8 inches which will, according to the manufacturer, yield an R-value of 13; (b) ceilings below attic areas to be insulated with BLOWN insulation to a thickness of 13 inches which will, according to the manufacturer, yield an R-value of 30; (c) vaulted ceilings to be insulated with BATT insulation to a thickness of 6 1/4 inches which will, according to the manufacturer, yield an R-value of 19; and (d) floor overhangs to be insulated with BATT insulation to a thickness of 3 5/8 inches which will, according to the manufacturer, yield an R-value of 13.

**5. OPTIONS; CHANGES.** After the execution of this Agreement, subject to the limitations set forth in the Stages of Construction Exhibit attached to the Agreement, Seller may (but shall not be obligated to) permit Purchaser to change the options to be included House. In order to change to the options in the House, Purchaser shall pay to Seller a Change Fee in the amount of Five Hundred and 00/100 Dollars ($500.00) for each such change at the time the request is approved by Seller. Any Change Fee paid shall be nonrefundable and shall not be credited against the Purchase Price. Any changes will be limited to a one time change order and shall not be effective unless evidenced by a written amendment to this Agreement. At the time of execution of that amendment, Purchaser shall pay to the Seller Option Money (as defined in Exhibit B) in the amount of the total increase in the Purchase Price resulting from the change. Any Option Money paid to Seller at any time shall not be held in escrow, and shall be nonrefundable to Purchaser except in the event of: (1) breach of this Agreement by Seller, or (2) termination of this Agreement by Seller pursuant to Section 2 above. Upon Closing, all Option Money previously paid to Seller shall be credited to Purchaser against the Purchase Price. Purchaser recognizes that any such changes to the House may affect the timing of completion of the House.

**6. COMPLETION.** Subject to the contingencies stated herein, Seller shall complete construction of the House prior to Closing. Seller shall construct the House according to all applicable governmental codes and regulations. Seller reserves the right to substitute materials or items to be used in the construction of the House with materials or items of equal or comparable value. Construction of the House shall be deemed complete when a certificate of occupancy is issued for the House by the applicable governmental authority. Seller shall deliver the completed House to Purchaser at Closing in "broom-clean" condition, ready to occupy. The House and Lot shall be free of all trash and debris.

**7. PURCHASER'S INQUIRIES.** Purchaser shall direct all inquiries and questions to Seller's on-site associate. The on-site associate will provide Purchaser with timely responses; however, the associate does not and shall not have authority to change the terms of this Agreement in any manner. This Agreement may be changed or modified only by a written amendment duly executed by both Purchaser and Seller. **Purchaser acknowledges that Seller's sales associates, superintendents, closing staff, warranty staff and other employees do not have authority to modify this Agreement**. Only an authorized corporate officer of Seller may modify this Agreement on Seller's behalf.

IN WITNESS WHEREOF, THE UNDERSIGNED, HAVING READ AND REVIEWED THIS ADDENDUM, HAVE SIGNED THIS ADDENDUM ON THE DATES SHOWN BELOW.

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1     VERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce     **Job:** **708760019**

**8:26-cv-00097-DCC    Date Filed 02/02/26    Entry Number 24-2    Page 23 of 35**

**PURCHASER:**

_____     5/7/2020

**Buyer:** William D Wyatt       Date

_____     5/7/2020

**Co-Buyer:** Jeanne M. Wyatt      Date

**SELLER:**

**D.R. Horton, Inc., a Delaware Corporation**

_____     5/11/2020

Sara Bouchillon       Date

Officer, D.R. Horton

_For Internal Purposes Only:_

Sales Representative:

_____     5/7/2020

**Sales Rep:** Mary Jeanette Pearce     Date

_____     5/7/2020

**Sales Rep:** Thomas Gary Henderson    Date

Page 2 of 2      Addendum 2 Construction in Progress (rev. 24-May-2018)

**ADDENDUM 3**
**CURRENT RESIDENCE CONTINGENCY**

This Addendum is attached to and made a part of that Home Purchase Agreement (the "Agreement") between **William D Wyatt and Jeanne M. Wyatt**, as Purchaser, and **D.R. Horton, Inc., a Delaware Corporation**, as Seller, regarding that parcel of land located in **ANDERSON** County, **SC**, briefly described as Lot **0019**, Block/Phase , **River Mill** subdivision, and referred to in the Agreement as the "Lot." All terms defined in the Agreement shall have the same meanings when used in this Addendum. Purchaser and Seller further agree as follows:

**1. CONTINGENCY.** The subsection checked below shall apply:

⊗ **a.** No Contingency. Purchaser agrees and acknowledge that Purchaser's performance of its obligations under this Agreement shall not be contingent upon the sale of Purchaser's current or former residence or any other property.

○ **b**. Contingency. Purchaser's performance of its obligations under this Agreement shall be contingent upon the closing of Purchaser's sale of certain real property owned by Purchaser identified below (the "Current Residence"). The contingency described in the foregoing sentence is referred to in this Addendum as the "Contingency." In the event the Contingency is not satisfied or waived in writing by Purchaser on or before the deadline stated below (the "Contingency Deadline"), either party may terminate this Agreement upon written notice to the other. In such event, the Earnest Money shall be refunded to Purchaser, the Option Money, if any, shall be retained by Seller, and neither party shall have any further liability or obligation to the other hereunder.

Current Residence: _____

_____, ____,

Contingency Deadline:     **07/06/2020**

**2. PURCHASER'S WARRANTIES.** If Section 1(b) above is checked, Purchaser represents and warrants as follows:

a. Purchaser warrants that the Current Residence is currently listed for sale (or will be listed within 5 business days of the Effective Date) with a reputable real estate brokerage licensed to do business in the state and county in which it is located, and that the Current Residence is listed by that brokerage firm in the authorized multiple listing service used by real estate agencies in the community in which it is located. Purchaser warrants that it shall maintain these listings of the Current Residence until it is sold or this Agreement is terminated.

b. Purchaser warrants that there ☐ **IS** / ☐ **IS NOT** a fully executed contract currently in effect for the sale of Purchaser's Current Residence.

c. Purchaser warrants that, except for the Contingency, this Agreement is not contingent upon the closing of a sale of any property owned by Purchaser and that, at the time of Closing, Purchaser will have sufficient cash available (together with the Loan) to complete the purchase of the Property contemplated in the Agreement. In the event the Purchaser does not have sufficient cash available at Closing or cannot obtain financing without closing on the sale of another property, Seller may terminate this Agreement upon written notice to Purchaser. In such event, Seller shall retain the Earnest Money and the Option Money, if any, and thereafter neither party shall have any further liability or obligation to the other hereunder.

**3. AUTOMATIC EXPIRATION.** Notwithstanding any other provision herein, if this Agreement has not been previously terminated, the Contingency shall automatically expire on the date that is ten (10) days after the Contingency Deadline and thereafter shall not be a condition to Purchaser's obligation to close on the purchase of the Property. FROM AND AFTER THAT DATE, PURCHASER SHALL NOT HAVE THE RIGHT TO TERMINATE THIS AGREEMENT FOR FAILURE OF THE CONTINGENCY TO BE MET OR SATISFIED.

**4. THIRD PARTY OFFERS; TERMINATION BY SELLER.** Purchaser acknowledges that Seller shall continue to market the Property so long as the Contingency remains in effect. If Seller receives a bona fide offer to purchase the Property from a third party during such period, then Seller shall notify Purchaser that it has received such offer. Purchaser shall then have forty-eight (48) hours from receipt of such notice to notify Seller that Purchaser waives the contingency to Purchaser's performance stated in this Addendum, in which event the contingency shall become void and have no further force or effect. If Purchaser does not so notify Seller within that time period, then Seller may terminate this Agreement upon written notice to Purchaser, in which event Seller shall refund all Earnest Money to Purchaser, Seller shall retain all Option Money, if any, and thereafter neither party shall have any further liability or obligation to the other under this Agreement.

**5. CONFLICT.** In the event of any conflict between the terms and provisions of the main text of this Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1

**Purchaser:**

DocuSigned by:

*William D Wyatt*
068552426B1B402...

_____  _____   5/7/2020

**Buyer:** William D Wyatt                        Date

DocuSigned by:

*Jeanne M. Wyatt*
B3E22D99794D482...

_____  _____   5/7/2020

**Co-Buyer:** Jeanne M. Wyatt                     Date

**Seller:**

**D.R. Horton, Inc., a Delaware Corporation**

DocuSigned by:

*Sara Bouchillon*
FEF4457F381C421...

_____  _____   5/11/2020

Sara Bouchillon                                   Date

Officer, D.R. Horton


*For Internal Purposes Only*
SELLER'S SALES REP:

DocuSigned by:

*Mary J Pearce*
AEFC0EE1E6D046A...

_____  _____   5/7/2020

**Sales Rep:** Mary Jeanette Pearce               Date

Page **2** of **2**        Addendum 3: Current Residence Contingency (rev. 3-Jan-2016)

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1

Buyer(s): William D Wyatt and Jeanne M Wyatt, **Community:** River Mill, **Plan:** , **Address:** 226 RIVER MILL PLACE, **Sales Rep:** Matt Manetta, Pr ...

**Printed:** 5/7/2020



### ADDENDUM 6
### SPECIAL STIPULATIONS

This ADDENDUM is attached to and made a part of that Home Purchase Agreement (the "Agreement") by and between **D.R. Horton, Inc., a Delaware Corporation**, as Seller, and **William D Wyatt and Jeanne M. Wyatt**, as Purchaser (the "Agreement") regarding that certain parcel of real estate located in **ANDERSON** County, **SC**, briefly described as Lot , **River Mill** Subdivision and referred to in the Agreement as the "Lot." All terms defined in the main text of the Agreement shall have the same meanings when used in this Addendum. In the event of conflict between any provision of this Addendum and any term or condition of the Agreement, this Addendum shall control. Notwithstanding any other provision of the Agreement, Seller and Purchaser agree as follows:

    1. Provided that all contract conditions are satisfied and met in a timely manner, Purchaser shall be entitled to a contribution from Seller toward Purchaser's closing costs up to $640. This amount is not conditioned on the use of any lender and is offered in addition to the amount on the BRICA/Addendum #1 if a preferred lender is utilized.

    2. Not applicable.

    3. Not applicable.

    4. Not applicable.

**IN WITNESS WHEREOF, THE UNDERSIGNED, HAVING READ AND REVIEWED THIS ADDENDUM, HAVE SIGNED THIS ADDENDUM ON THE DATES SHOWN BELOW.**

PURCHASER:

SELLER:
**D.R. Horton, Inc., a Delaware Corporation**

DocuSigned by:
*William D Wyatt*
068552426B1B402...

5/7/2020

_____  _____
**Buyer:** William D Wyatt          Date

DocuSigned by:
*Sara Bouchillon*
FEF4457F381C421...

5/11/2020

_____  _____
Sara Bouchillon                  Date

Officer, D.R. Horton

DocuSigned by:
*Jeanne M. Wyatt*
B3E22D99794D482...

5/7/2020

_____  _____
**Co-Buyer:** Jeanne M. Wyatt       Date

Addendum 6: Special Stips (rev. 3-Jan-2016)

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1

8:26-cv-00097-DCC    Date Filed 02/02/26    Entry Number 24-2    Page 27 of 35

Buyer(s): William D Wyatt and Jeanne M. Wyatt, Community: River Mill, Plan: , Address: , RIVER, COMM, PLACE, Sales Rep: Mary Jeanette Ericson

Job: 708760019
Printed: 5/7/2020

## ADDENDUM 9
## VARIATIONS IN MATERIALS AND COMPONENTS

This Addendum is attached to and made a part of that Home Purchase Agreement (the "Agreement") between William **D** Wyatt and Jeanne M. Wyatt, as Purchaser, and **D.R. Horton, Inc., a Delaware Corporation**, as Seller, regarding that parcel of land located in **ANDERSON** County, **SC**, briefly described as Lot **0019**, Block/Phase , **River Mill** subdivision, and referred to in the Agreement as the "Lot." All terms defined in the Agreement shall have the same meanings when used in this Addendum. Purchaser and Seller further agree and acknowledge as follows:

**1.** Many materials, both natural and man-made, used in the construction of homes contain variations and inconsistencies. Such variations and inconsistencies are beyond Seller's control, and Seller shall not be responsible or liable for them. Some of the materials and components which may exhibit variations and inconsistencies are detailed in the sections below.

**2.** CONCRETE. Purchaser understands and acknowledges that when adding additional concrete to the existing concrete pad, the two pads may not match in color. Also, there may be visible seam between the two pads.

**3.** INTERIOR PAINT. Seller installs a level 4 drywall/Gypsum Board finish in its homes. White or light color flat paint is recommended for this type of finish and is a standard feature in Seller's homes. Colored, gloss or semi-gloss paint are not recommended as they may magnify joint or patch photographing in critical lighting areas.

**4.** OUTLET LOCATIONS. Purchaser understands that any cable, phone and/or data outlet locations that are not specifically designated at the initial time of selections will be placed by the construction supervisor, and will not be moved.

**5.** WOOD.

a. Purchaser understands that wood of the same species will vary in color, mineral streaking, texture, pitch pockets, and grain uniformity, depending on when, where and how the tree grew and the fact that different wood products come from different manufacturers. These characteristics may occur on adjacent cabinets, between pair of doors and/or drawers, with the same cabinet panels, between flooring, stair treads and railings and between flooring and cabinets/vanities. It is these differences, caused by nature, that create the warmth and individuality of fine woods. Darker finishes tend to hide some of these natural characteristics while lighter finishes tend to accentuate the differences. Because of this, the variations in color and contrast may be different than in a display or in a smaller sample.

b. Seller shall not be responsible under any circumstances for damage or wear to hardwood flooring caused in whole or in part by moisture. Please refer to the Limited Warranty administered by Residential Warranty Corporation for terms, conditions, and exclusions pertaining to flooring.

**6.** STUCCO. The final appearance of your home may be impacted by sunlight angles, shadows from architectural details, application and texturing techniques, environmental surrounding and color lot to color lot variations.

**7.** BRICK/STONE. Brick and stone products are composed of earthen materials and go through many processes before firing and consequently each run or lot of brick/stone will vary. Photographs, samples and even completed homes are only a representation of the color and each run or lot and even installation can vary from home to home. An exact replication of total color or percentages as displayed by samples or model homes cannot be guaranteed.

**8.** GRANITE/CERAMIC/MARBLE. The materials used in counter tops, fireplace surrounds/hearths, wall and floor tile contain color variations and "veining", natural blemishes, and grain. Accordingly, consistency <u>cannot be guaranteed.</u>

**9.** In the event of any conflict between the provisions of this Addendum and the provisions of the Agreement, the Agreement shall control. In the event of any conflict between the provisions of this Addendum and the provisions of the Limited Warranty, the Limited Warranty shall control.

IN WITNESS WHEREOF, THE UNDERSIGNED, HAVING READ AND UNDERSTOOD THIS ADDENDUM, HEREBY EXECUTE THIS ADDENDUM AS OF THE DATES SHOWN BELOW.

| Purchaser: | Seller: |
|---|---|
| DocuSign by: *William D Wyatt* — 068552426B1B402... | **D.R. Horton, Inc., a Delaware Corporation** |
| _____ 5/7/2020 | DocuSign by: *Sara Bouchillon* — FEF4457F381C421... |
| **Buyer:** William D Wyatt    Date | _____ 5/11/2020 |
| DocuSign by: *Jeanne M. Wyatt* — B3E22D99794D482... | Sara Bouchillon    Date |
| _____ 5/7/2020 | Officer, D.R. Horton |
| **Co-Buyer:** Jeanne M. Wyatt    Date | |

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1



**ADDENDUM 11**
**CLOSING ATTORNEY INCENTIVE**

This **ADDENDUM** is attached to and made a part of that Home Purchase Agreement between **D.R. Horton, Inc., a Delaware Corporation**, as Seller, and **William D Wyatt and Jeanne M. Wyatt** as Purchaser (the "Agreement"), regarding that parcel of real estate located in **ANDERSON** County, **SC**, briefly described as Lot **0019**, **River Mill**, and referred to in the Agreement as the "Lot." In the event of any conflict between the terms and provisions of this Addendum and the terms and provisions of the main text of the Agreement, the terms and provisions of this Addendum shall control. All terms defined in the main text of the Agreement shall have the same meanings when used in this Addendum. Seller and Purchaser hereby agree as follows:

1. Seller has recommended Harvey & Vallini, LLC, 100 Verdae Boulevard, Suite 400, Greenville, South Carolina 29607 ("Harvey & Vallini") to act as settlement agent and close the purchase of the Property. Purchaser acknowledges that there are numerous settlement agents available to Purchaser, and that Purchaser is free to use any settlement agent it chooses to close the purchase of the Property contemplated in this Agreement. If Purchaser chooses to use Harvey & Vallini to act as settlement agent and close the purchase of the Property, Seller shall provide Purchaser a credit at closing in the amount of **$7,050.00** towards the total Purchase Price for the House (hereinafter referred to in this Addendum as the "Closing Attorney Credit").

2. Purchaser hereby elects to use Harvey & Vallini to act as settlement agent and close the purchase of the Property. In consideration of such election, Seller shall provide Purchaser the Closing Attorney Credit at Closing.

3. The parties hereby acknowledge that the Closing Attorney Credit is already reflected in the "Special Discount" line in the table in Section 2 of the Agreement. In the event Purchaser elects to use a different settlement agent at Closing, the parties shall amend the Agreement to remove the Closing Attorney Credit and the Purchase Price shall be adjusted accordingly.

**IN WITNESS WHEREOF, THE UNDERSIGNED, HAVING READ AND REVIEWED THIS ADDENDUM, HAVE SIGNED THIS ADDENDUM ON THE DATES SHOWN BELOW.**

**Purchaser:**

DocuSigned by:
*William D Wyatt*
068552426B1B402...
_____    5/7/2020
**Buyer:** William D Wyatt        Date

DocuSigned by:
*Jeanne M. Wyatt*
B3E22D99794D482...
_____    5/7/2020
**Co-Buyer:** Jeanne M. Wyatt        Date

**Seller:**

**D.R. Horton, Inc., a Delaware Corporation**

DocuSigned by:
*Sara Bouchillon*
FEF4457F381C421...
_____    5/11/2020
Sara Bouchillon        Date

Officer, D.R. Horton

rev. 11-Sept-2018

# Closing Disclosure Contact Information

Below is information intended to assist interested parties with the completion of the Closing Disclosure.

**GENERAL INFORMATION**

| | |
|---|---|
| **Buyer(s):** | William D Wyatt and Jeanne M. Wyatt |
| **Subdivision:** | River Mill |
| **Lot Address:** | 126 RIVERMILL PLACE, PIEDMONT, SC  29673 |
| **Lot/Block:** | / | **Builder Key:** | 708760019 |
| **Total Price:** | $312,000.00 | **Ratify Date:** |

**REAL ESTATE BROKER INFORMATION (BUYER)**

**Company Name:**
**Company Address:**

**Broker Officer:**
**Broker Officer License:**                              **Officer Email:**
**Agent Name:**
**Agent License:**
**Agent Email:**
**Agent Cell:**
**Agent Work:**
**Agent Fax:**

**REAL ESTATE BROKER INFORMATION (SELLER)**

| | |
|---|---|
| **Company Name:** | D.R. Horton, Inc., a Delaware Corporation |
| **Company Address:** | 100 Verdae BlvdSuite 401 |
| | Greenville, SC  29607 |
| **Company License:** | _____ |
| **Agent Name:** | Mary Jeanette Pearce |
| **Agent License:** | |
| **Agent Email:** | MJPearce@drhorton.com |
| **Agent Cell:** | (864) 313-8849 |
| **Agent Work:** | |

**SELLER INFORMATION**

| | |
|---|---|
| **Name:** | D.R. Horton, Inc., a Delaware Corporation |
| **Address:** | 100 Verdae BlvdSuite 401 |
| | Greenville, SC  29607 |

**SETTLEMENT AGENT INFORMATION**

| | |
|---|---|
| **Company Name:** | HARVEY & VALLINI |
| **Company Address:** | 100 Verdae Boulevarde, Suite 400 |
| | GREENVILLE, SC  29607 |
| **Title Request Email:** | *scupstatepackages@hvlawsc.com* |
| **Agent Email:** | drhgreenville@hvlawsc.com |
| **Agent Cell:** | |
| **Agent Work:** | (864) 729-6870 |
| **Agent Fax:** | |

## NOTICE OF SELLER'S BUSINESS AFFILIATIONS

TO: **William D Wyatt and Jeanne M. Wyatt**
    [Homebuyer(s)]

PROPERTY: **126 RIVERMILL PLACE**

FROM: **D.R. Horton, Inc., a Delaware Corporation**
    [Seller]

DATE: **05/07/2020**

This is to give you notice that the above referenced seller has a business relationship with:

**DHI MORTGAGE COMPANY, LTD.**
100 Verdae Blvd., Ste. 401
Greenville, SC 29607

**DHI MORTGAGE COMPANY, LTD.**
503 Bellgreen Avenue
Simpsonville, SC 29680

**D.R. HORTON INSURANCE AGENCY, INC.**
1341 Horton Circle
Arlington, TX 76011

**DHI TITLE OF SOUTH CAROLINA**
10700 Pecan Park Blvd, Ste 220
Austin, TX 78750

The nature of this business relationship is that these companies are corporate affiliates, each being 100% wholly owned by, or by a subsidiary of, the same parent corporation. Because of this relationship, this referral may provide seller a financial or other benefit.

Set forth below is the estimated charge or range of charges by each company for settlement services listed. You are **NOT** required to use these companies as a condition of your purchase of the property from seller or as a condition of your application for, or settlement of, a mortgage loan on the property in connection with your purchase. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

| DHI MORTGAGE COMPANY, LTD. | | DHI TITLE OF SOUTH CAROLINA | |
|---|---|---|---|
| **Service** | **Charge or Range** | **Service** | **Charge or Range** |
| Loan Origination Charge: | 0% of Loan Amount plus $995.00 | Simultaneous Lender's Title Insurance | $100.00 - $250.00 |
| | An additional 1% of the Loan Amount may apply for certain Affordable Housing Loan Programs | Owner's Title Insurance: | $750.00 - $900.00 |

**DHI Title charge estimates are based on an average home price of $300,000. Title Insurance Rates are set by the state. Adjustments to Sales Price, Loan Amount and Lender requirements will impact the cost of your title insurance. Mortgage fees may vary depending upon whether the loan is originated or brokered by DHI Mortgage Company, Ltd.**

**Note: If you apply with DHI Mortgage Company, Ltd., a Loan Estimate of all settlement charges will be provided to you by DHI Mortgage Company, Ltd. at or within three business days after loan application.**

**You may be entitled to additional builder discounts/credits paid by the seller to purchase multiple settlement services as set forth in the Builder's Incentive and Concessions Addendum to your purchase contract.**

---

**D. R. HORTON INSURANCE AGENCY, INC.**

D.R. HORTON INSURANCE AGENCY, INC. is a licensed insurance agent that offers policies of property insurance as agent for one or more insurance companies qualified to transact insurance business in the state of South Carolina. You will be provided a separate proposal or quote of the terms and conditions of any policy of insurance offered by D.R. HORTON INSURANCE AGENCY, INC. in which you express an interest. For comparison purposes, the cost for a hazard insurance policy for a home valued at $300,000 with commonly selected coverage items and deductibles would range between: $323 and $11,274 per annum. The specific premium depends on various factors, including but not limited to, the value of the home, the location of the home, deductibles selected, and the amount of coverage selected. The quote will set out the estimated premium and other charges, or range of charges, by D.R. HORTON INSURANCE AGENCY, INC. for its insurance products or services.

---

**ACKNOWLEDGMENT:**
I/we have read this disclosure form and understand that seller is referring me/us to purchase the above-described settlement services from **DHI MORTGAGE COMPANY, LTD., DHI TITLE OF SOUTH CAROLINA,** and **D.R. HORTON INSURANCE AGENCY, INC.**, and may receive a financial or other benefit as the result of this referral.

DocuSigned by:
*William D Wyatt*
068552426B1B402...
         5/7/2020
**Buyer:** William D Wyatt      Date

DocuSigned by:
*Jeanne M. Wyatt*
B3E22D99794D482...
         5/7/2020
**Co-Buyer:** Jeanne M. Wyatt      Date

Revised 02.19.2020 jem

Revised 02.19.2020 jem

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1

**Buyer(s):** William D Wyatt and Jeanne M. Wyatt, **Community:** River Mill, **Plat:** //, **Address:** 126 RIVERMILL PLACE, **Sales Rep:** Mary Jeanette Pearce       **Job:** **708760019**
   **Printed:** 5/7/2020

**Addendum \***

**RADON PASSIVE SYSTEM ADDENDUM**

This Radon Passive System Addendum (this "Addendum") is attached to and made a part of that certain Home Purchase Agreement (the "Agreement") between **D.R. Horton, Inc., a Delaware Corporation** ("Seller"), and **William D Wyatt and Jeanne M. Wyatt** ("Purchaser") regarding that parcel of land located in **ANDERSON COUNTY**, **SC**, briefly described as Lot **0019** of **River Mill** subdivision (the "Subdivision"), and referred to in the Agreement as the "Property" or the "Lot." Capitalized terms not defined herein shall have the meaning assigned to them in the Agreement. Notwithstanding any other provision of the Agreement, Seller and Purchaser agree as follows:

1.    In the event of a conflict between the terms and provisions of this Addendum and any other terms and provisions of the Agreement, this Addendum shall control as to all matters addressed within this Addendum.

2.    Seller has disclosed to Purchaser and Purchaser understands and acknowledges the following (the "Disclosed Matters") regarding the Property and the Subdivision:

a.    **RADON GAS: RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE RECOMMENDED ACTION LEVELS HAVE BEEN FOUND IN BUILDINGS IN ANDERSON COUNTY, SC**

b.    The applicable governing authorities have determined that the Property is located in an area that has experienced, or in the future may experience, elevated levels of radon based on the local geology, radon tests in the area, and other factors.

c.    **SELLER IS NOT RESPONSIBLE FOR ANY RADON GAS OR RELATED SUBSTANCES THAT MAY BE ON OR NEAR THE SUBDIVISION OR THE PROPERTY OR IN THE HOME ON THE PROPERTY AFTER IT IS CONSTRUCTED.**

d.    Seller is building the home on the Property to include a Passive Radon Vent System (the "System"). Purchaser should not perform any construction or repairs or take any other action that will modify, impair or interfere with the System and/or its operation. Purchaser should satisfy itself as to any restrictions and obligations that may apply regarding the System.    **SELLER CANNOT GUARANTEE THAT RADON WILL NOT ENTER THE HOME WITH THE SYSTEM, OR ANY RADON-REDUCTION SYSTEM. SELLER IS PROVIDING NO WARRANTY WHATSOEVER WITH RESPECT TO THE SYSTEM.**

e.    Additional information about radon can be found by visiting the website for the U.S. Environmental Protection Agency (the "EPA") at http://www.epa.gov/radon/ or calling the EPA at (800) 557-2366, or by visiting the website for the South Carolina Department of Health and Environmental Control                (the                "SCDHEC")                at http://www.scdhec.gov/HomeAndEnvironment/YourHomeEnvironmentalandSafetyConcerns/Radon/    or calling the SCDHEC at (800) 768-0362.

3.    Except as stated in this Addendum, Seller, its parent, subsidiaries and affiliates, and each of their respective officers, directors, employees, agents, heirs, personal representatives, successors, and assigns (the "Seller Parties"), have not made and do not make any warranties, representations, promises or statements of any kind, whether written or oral, express or implied, with regard to the Subdivision, the Property or the home located on the Property concerning (a) the presence or absence of radon gas: (i) in the soils beneath or adjacent to the Property; or (ii) in or near the home on the Property prior to, on or after closing; (b) environmental conditions at or emanating from the Property; or (c) existing or potential environmental effects associated with any of the same or from any other radon sources not specifically identified herein. The Seller Parties make no representation or warranty of any kind, express or implied, regarding the effectiveness of any architectural or engineering activities for reducing the presence of radon.

4.    THE DISCLOSED MATTERS MAY ADVERSELY AFFECT (I) THE VALUE OF THE PROPERTY OR THE HOME ON THE PROPERTY, AND/OR (II) THE USE, ENJOYMENT AND/OR OWNERSHIP OF THE PROPERTY OR THE HOME ON THE PROPERTY BY THE PURCHASER AND/OR PURCHASER'S HEIRS, SUCCESSORS, INVITEES, LICENSEES, ASSIGNS, AND LEGAL REPRESENTATIVES (THE "PURCHASER PARTIES").

5.    Purchaser acknowledges that this Addendum: (i) is not intended to, and does not, constitute a full disclosure of all conditions that might affect the Subdivision, the Property or the home on the Property; and (ii) does not relieve Purchaser from its obligations to investigate the Subdivision, the Property or the

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1

Radon Passive System Addendum
Page 2

home on the Property to satisfy itself that the Subdivision and the Property are satisfactory to Purchaser.  In addition, Purchaser acknowledges that the Seller Parties have no duty to update, and will not update, this Addendum or the information contained in this Addendum (including, without limitation, any references to the websites or telephone numbers set forth in Paragraph 2.e. above).

6.    THE PURCHASER PARTIES HEREBY RELEASE THE SELLER PARTIES FROM ANY AND ALL CLAIMS, DEMANDS, LOSSES, COSTS, INJURIES, OR DAMAGES, KNOWN OR UNKNOWN, THAT THE PURCHASER PARTIES MAY HAVE, AT ANY TIME, THAT ARE IN ANY WAY RELATED TO, CONNECTED WITH, OR THAT ARISE OUT OF, DIRECTLY OR INDIRECTLY, THE DISCLOSED MATTERS OR THEIR EFFECTS, PRESENT OR FUTURE, ON THE HEALTH OR SAFETY OF THE PURCHASER PARTIES OR ANY OTHER AREAS WITHIN OR AROUND THE PROPERTY.  IT IS THE SPECIFIC INTENT OF THE PURCHASER PARTIES TO FULLY RELEASE AND DISCHARGE EACH AND ALL OF THE SELLER PARTIES FROM ANY AND ALL LIABILITY RELATED TO THE DISCLOSED MATTERS.

IN WITNESS WHEREOF, THE UNDERSIGNED, HAVING READ, REVIEWED AND UNDERSTOOD THIS ADDENDUM, HAVE SIGNED THIS ADDENDUM ON THE DATE SHOWN BELOW.

**PURCHASER:**

DocuSigned by:

*William D Wyatt*
068552426B1B402...
_____    5/7/2020
**Buyer:** William D Wyatt        Date

DocuSigned by:

*Jeanne M. Wyatt*
B3E22D99794D482...
_____    5/7/2020
**Co-Buyer:** Jeanne M. Wyatt        Date

Page 2
Rev 5/7/20

Gardere01 - 10087291v.1

# D.R. Horton Smart Home Disclosure and Installation Contact Form

Congratulations on your new D.R. Horton Smart Home!  Your new home is equipped with technology that includes the following: a Z-Wave programmable thermostat manufactured by Honeywell; a Z-Wave door lock manufactured by Kwikset; a Z-Wave wireless switch manufactured by Eaton Corporation; a Qolsys, Inc. touchscreen Smart Home control device; an automation platform from Alarm.com; a SkyBell video doorbell; and an Amazon Echo Dot (collectively, "**Smart Home Technology**").*  Other Smart Home technology features may be offered for an additional charge.

The SkyBell video doorbell and the Amazon Echo Dot will be installed by a third party ("**Installer**") *after closing*.  At that time, the Installer will activate certain components of the Smart Home Technology and will provide training to you on how to use the Smart Home Technology.

The Alarm.com home automation-only application (the "**App**") is included at no charge to you for 36 months following the close of escrow on your home.  Thereafter, the App may be purchased directly from the Installer for a monthly fee or, if you have contracted with the Installer for security monitoring services, the App is included with such security-monitoring services.

In order to install and activate the Smart Home Technology, the Installer must contact you to schedule an appointment.  Please indicate by checking the appropriate box below whether D.R. Horton may provide your contact information to the Installer so the Installer can contact you to schedule an appointment for the installation and activation of the Smart Home Technology. For the Smart Home Technology to work, you must obtain and pay for your own Internet service, and you may need to purchase compatible devices and to maintain accounts with third parties for the services.  The Installer will discuss these requirements with you prior to the appointment to ensure the installation and activation goes smoothly.  D.R. Horton may receive a referral fee from the Installer if you purchase additional services or products from the Installer.

⊘  By checking this box and executing this form below, I, the undersigned, hereby **_authorize_** the Installer to contact me, from time-to-time, by telephone, text message, mail and/or email to schedule an appointment to install and activate the Smart Home Technology and to discuss other services offered by the Installer.  I give my consent for the Installer to contact me at the telephone numbers, email addresses or mailing addresses that I provide below using any method including automatic telephone dialing systems and/or an artificial or pre-recorded voice, even if such numbers, email addresses, or mailing addresses are listed on a "do not call" or similar list.

○  By checking this box and executing this form below, I do **_not_** give D.R. Horton my permission to provide my contact information to the Installer, and any contact information shown below will <u>not</u> be provided to Installer.  I acknowledge that it shall be my responsibility to contact the Installer to schedule an appointment for the installation and activation of the Smart Home Technology in my home, and until I do so, some of the Smart Home Technology will not be delivered, installed and/or functional in my home.

<u>PRIVACY DISCLOSURE</u>:  Devices installed in your home that are connected to the Internet, including the Smart Home Technology, may collect information about you and your use of the device.  This automated information is collected, used and analyzed by the third-party providers of the devices and is governed by the terms, conditions, policies and practices of such third-party providers only.  D.R. Horton recommends that you carefully review your agreements with, and other terms and conditions published by, these third-party providers.  D.R. Horton does not collect any information from these devices about you or your use of the devices.

I acknowledge and agree that D.R. Horton does not make any representations or warranties that any or all of the Smart Home Technology is secure, will meet any of my needs or will provide any level of physical or cyber security for my home – even if the Smart Home Technology is working as intended.

Cell Phone #:   Work Phone #:  Home Phone #: (207) 415-1775

Email Address (primary): wdwyatt@wdwyatt.com       Email Address (secondary): jmwyatt@wdwyatt.com

My New Home – Address /Direct Mail: 126 RIVERMILL PLACE, PIEDMONT, SC  29673
Projected Closing Date: 05/29/2020

Community/Subdivision Name: River Mill
Street # & Name: 126 RIVERMILL PLACE

DocuSign Envelope ID: 151F7647-F172-4204-8F03-53DEE56EBBC1

DocuSigned by:

*William D Wyatt*
068552426B1B402...

_____  5/7/2020
**Buyer:** William D Wyatt                     Date

DocuSigned by:

*Jeanne M. Wyatt*
B3E22D99794D482...

_____  5/7/2020
**Co-Buyer:** Jeanne M. Wyatt                 Date

*D.R. Horton reserves the right, without prior notice, to substitute other products for the Smart Home Technology products listed above.